**STATE of Minnesota, Respondent,**

v.

**Brian Lee FLOWERS, Appellant.**

No. A09–1359.

Supreme Court of Minnesota.

Sept. 16, 2010.

Lori Swanson, Attorney General, St. Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Michael Richardson, Assistant County Attorney, Minneapolis, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Bradford Colbert, Assistant State Public Defender, St. Paul, MN, for appellant.

## OPINION

PAUL H. ANDERSON, Justice.

The Hennepin County Grand Jury indicted 16–year–old Brian Flowers on two counts of first-degree premeditated murder, Minn.Stat. §§ 609.185(a)(1), 609.05, subd. 1 (2008), and two counts of first-degree murder while committing or attempting to commit aggravated robbery, Minn.Stat. §§ 609.185(a)(3), 609.05, subd. 1 (2008), for causing the deaths of Katricia Daniels and Robert Shepard. A jury found Flowers guilty of all four counts. The Hennepin County District Court sentenced Flowers to two consecutive terms of life in prison for the premeditated murder of Daniels and the premeditated murder of Shepard. Flowers appealed his convictions, claiming that (1) the court violated his Fifth Amendment rights by erroneously admitting into evidence the first statement he gave to the police; (2) the court erred when it failed to instruct the jury on his defense theory; and (3) the evidence was insufficient for a finding of guilt beyond a reasonable doubt. We affirm.

Katricia Daniels lived with her boyfriend, J.W., and two of her children, 10 year-old Robert Shepard and 16 month-old J.M., in a Minneapolis duplex. On the evening of June 11, 2008, J.W. left for work, leaving Daniels, Shepard, and J.M. at home. When J.W. returned the next morning, he discovered the bodies of Daniels and Shepard. J.M. was sitting on a bed, unharmed. After discovering Daniels's and Shepard's bodies, J.W. took J.M. to the home of a neighbor, who called 911.

Several Minneapolis police officers arrived at the duplex shortly after the 911 call and officers from the city's crime lab

unit began to collect evidence at the scene. Daniels's home was a mess throughout; several items were knocked over, several pieces of furniture were broken, and there was a significant amount of blood in the hallway, two bedrooms, dining room, kitchen, and bathroom. The police found Daniels's body in the bathroom near the southeast bedroom and Shepard's body in the north bedroom. According to a police officer from the crime lab unit, there was "a lot of evidence" at the home, and it took officers five days to complete the process of collecting evidence. A significant amount of DNA analysis was completed as part of the investigation.

Two investigators with the police homicide unit, Sergeant Gerald Wallerich and Sergeant Gerhard Wehr, were on call the morning of June 12 and participated in the investigation. Wallerich and Wehr obtained Daniels's cellular telephone records, and discovered that an outgoing call had been made from Daniels's telephone to a person named Tiffany Simmons. The investigators interviewed Simmons the next morning, June 13, and Simmons admitted that her boyfriend, Stafon Thompson, and the appellant, Brian Flowers, spent time at Daniels's home on the night of June 11. Simmons explained to the investigators that Thompson and Flowers were with her in her car the evening of June 11, and she dropped them off near Daniels's home at around 10:00 p.m. She also stated that she later met with Thompson outside Daniels's home to get some gas money, and eventually picked Thompson up at E.J.'s home at 1:30 a.m. on June 12. E.J. was the uncle of a friend of both Thompson and Flowers. E.J.'s home was approximately two blocks south of Daniels's home. After the investigators finished speaking with Simmons they asked her to have Thompson and Flowers contact them.

At about 5:00 p.m. the next day, June 13, Thompson, who was 17 years old, called the investigators and explained that he, Flowers, and Simmons were at Flowers's home and were willing to speak with the investigators. Wallerich and Wehr went to Flowers's home and asked if Thompson, Flowers, and Simmons would be willing to go downtown to the police station to speak to the investigators about the investigation into the deaths of Daniels and Shepard. All three agreed, and Simmons drove Thompson and Flowers to the police station. At the police station, each of the three individuals was placed in a separate interview room and they were then interviewed one at a time.

The investigators first interviewed Simmons, and then Thompson. Flowers, who was 16 years old, was the last of the three to be interviewed. During his first interview, Flowers explained he had a disagreement with his mother on June 10 and as a result could not stay at his home on the nights of June 10 and 11. He stated that on June 11 he and Thompson went to Daniels's home at around 10:00 p.m. to "visit Little Robert and [Daniels]." Flowers was friends with Daniels's oldest son, who did not live with Daniels, and he explained that Daniels was "like our mom [and] she treated us like a son." He said that while at Daniels's home he got something to eat and that he and Thompson "were just talking to her ... [and were] just playing a video game with Robert." According to Flowers, when they left Daniels's home at about midnight, she was fine. Flowers stated that while walking in a nearby park, he and Thompson got into an argument with members of the Bloods gang. After the altercation with the Bloods, they went to E.J.'s home, where Flowers used the telephone to call his friend L.R. at around 1:30 a.m. Thompson used the same telephone to call Simmons. Simmons then drove to E.J.'s home, and

Thompson went home with Simmons. Flowers left to meet L.R., eventually going home at 4:00 or 5:00 a.m. to sleep on his porch.

After the interviews were completed and while Thompson, Flowers, and Simmons remained in their respective interview rooms, the investigators received information from another individual that Simmons had earlier admitted to her roommate that she "had knowledge of those murders." Based on this information, the investigators began another round of interviews, beginning with Simmons. When confronted with the new information, Simmons changed her story. She explained that she actually picked up Thompson and Flowers from E.J.'s home at 3:00 a.m. and brought them to her home, where they spent the night. She explained that Thompson and Flowers told her that gang members had entered Daniels's home, and that Thompson and Flowers ran away because they were scared. Simmons stated that Thompson was covered with blood when she picked him up, and had cuts on his hands. She said Thompson eventually threw his bloody clothes away.

Following this second interview with Simmons, the investigators placed Thompson and Flowers under arrest, gave each of them an "enhanced" *Miranda* warning for juveniles, and interviewed them separately for a second time. The second Flowers interview took place at approximately 8:10 p.m. During this interview, Flowers stated that he did not kill either Daniels or Shepard, but admitted that Thompson killed Daniels because he wanted her car, or "wanted somethin" and killed Shepard so that there would be no witnesses to his actions. Flowers explained that Thompson first hit Daniels with a golf club, and then stabbed her, and at some point Daniels tried to lock herself in the bathroom. He also explained that

Thompson hit Shepard with a TV, knocking him out, and then stabbed him. Flowers said, "I was trying to keep Rob in there, keep Rob in his room. Because Rob was in the room and I (inaudible) stay here because I didn't want him to see his mom."

Flowers claimed that he asked Thompson to stop and that he tried to grab Thompson, but Thompson "pushed [him] off." He also claimed that "I was just (inaudible) to get out of there (inaudible); I didn't want any part (inaudible)." Flowers admitted that before Shepard was attacked, he took Daniels's cellular telephone from her bedroom when told to do so by Thompson and later threw the telephone in an alley garbage can. Flowers explained that while standing in the alley after he and Thompson left Daniel's home, Thompson yelled at him because Flowers "didn't do anything."

A grand jury indicted Flowers on two counts of first-degree premeditated murder, Minn.Stat. §§ 609.185(a)(1), and 609.05, subd. 1 (2008), and two counts of first-degree murder while committing or attempting to commit aggravated robbery, Minn.Stat. §§ 609.185(a)(3) and 609.05, subd. 1 (2008). The indictment states that Flowers, "acting alone or intentionally aiding, advising, hiring, counseling, or conspiring with . . . Thompson" caused the death of Daniels and Shepard.

At Flowers's trial, Simmons testified about the events leading up to the night of June 11 and the morning of June 12. According to Simmons, Flowers needed somewhere to sleep on the night of June 10 because he could not stay at his home. That night, Flowers slept on a couch in the home Simmons shared with her roommate while Simmons and Thompson slept in Simmons's room. On June 11, Thompson, Flowers, and Simmons all spent time together during the day. Simmons said she did not want Flowers to stay at her home

that night because she did not want to upset her roommate. Flowers apparently tried to return to his home but his parents would not let him stay there. Thompson then suggested that Flowers stay at Daniels's home. The plan was that Simmons would drive Thompson and Flowers to Daniels's home, Thompson would go inside with Flowers because Thompson knew Daniels better than Flowers, and then Thompson would leave with Simmons. Simmons drove Thompson and Flowers to Daniels's home, Thompson and Flowers went into the home, but when Thompson returned to the car, he told Simmons that he was going to stay at Daniels's for the night.

Simmons also testified that Thompson used Daniels's telephone to call her at around 11:00 p.m. to make plans to meet her the next day. She next received a call from Thompson at about 4:00 a.m. Thompson was calling from E.J.'s home. Simmons stated that Thompson was upset, and asked her to come to E.J.'s home to pick him up. Simmons drove to E.J.'s home and picked up both Thompson and Flowers. At that time, Thompson complained to her about his hands hurting and she noticed that Thompson's hands had several cuts. Flowers sat quietly in the back seat, except that he did ask if they could stop at a store. Simmons refused to do so.

When they arrived at Simmons's home, Simmons noticed that Thompson had blood on his clothes; but Simmons testified that she did not see any wounds, blood, or other unusual markings on Flowers. Thompson and Flowers told Simmons that they were in Daniels's home when members of the Bloods gang walked by. They exchanged words, and the Bloods gang members came into Daniels's home and fought briefly with Thompson and Flowers. At that time, Thompson and Flowers ran out of the home because they were scared. Simmons asked them why they left Daniels and her children there alone, but neither Thompson nor Flowers gave any explanation other than that they were scared. Thompson and Flowers stayed at Simmons's home that morning. Simmons eventually took Flowers to his parents' home. Later during the evening of the same day, the police contacted Simmons.

Sergeants Wallerich and Wehr testified at trial about their first interview with Simmons on June 12 and eventually getting in contact with Simmons, Thompson, and Flowers during the afternoon of June 13. Wallerich and Wehr testified about meeting the three individuals at the police station, interviewing each separately, the tip that they received regarding Simmons's knowledge of the murders, and placing Thompson and Flowers under arrest before obtaining a second statement from each. At trial, the State played a video and audio recording of both of Flowers's statements.

The State presented extensive testimony about the crime scene and the evidence the police found there. The State presented evidence that both Daniels and Shepard were brutally murdered during the early morning hours of June 12. A detective from the homicide unit of the Minneapolis Police Department testified that while there were no signs of forced entry into Daniels's home, there were several signs of a protracted struggle. Blood was splattered on the walls of several rooms, bloody footprints were found throughout the home, the north bedroom "was in complete disarray," and several items were broken.

The detective also testified about the location and conditions of the victims' bodies. Shepard was found lying on his stomach just inside the doorway of the north bedroom. A broken television set that had blood on it lay next to Shepard, and bro-

ken plastic from the television was on his back. Shepard's legs were wrapped in bed sheets, and his feet were under a mattress. Papers were strewn about the floor. According to the detective, it appeared as if Shepard was attacked while in bed and was then hit with the television set while he was lying on the floor, and it also appeared as though the room had been searched.

Daniels's body was found in the bathroom, which was on the southeast end of the duplex. The toilet stool was knocked off its base slightly, and the bathroom door handle was broken off the door. There were gouges on the wall, and a large amount of blood on the walls and floor.

The detective also testified that bloody footprints led from the bathroom, through the hall, to the southeast bedroom. The doorknob into that bedroom was broken, and blood was splattered on the carpeting, the walls, both sides of the door, and the closet. The mattress in the bedroom was askew, and one corner of the mattress was saturated with blood. The police found parts of a broken knife, the blade and handle, as well as an intact knife and a golf club with a slightly bent shaft in the hallway between the bathroom and the southeast bedroom. Another knife was recovered in the alley behind the home. The style of the knife found in the alley matched the knives that remained in a knife block in Daniels's kitchen.

The medical examiner who performed the autopsy on Daniels testified that Daniels had suffered 193 sharp force injuries, mostly from the chest up, including approximately 56 defensive wounds on her hands and forearms. The examiner also testified that multiple sharp force injuries caused Daniels's death and it was his opinion to a reasonable medical certainty that the manner of death was a homicide.

The medical examiner who performed the autopsy on Shepard testified that Shepard had suffered both sharp force and blunt force injuries, mostly on his head, neck, arms, and shoulders. More specifically, Shepard suffered two life-threatening stab wounds to the neck and a pattern bruise on his jaw line consistent with the "plastic venting portion" of the television found next to him. Shepard had bruising caused by blunt force trauma on the back of his left and right shoulders, but the examiner stated that he could not conclude what caused the bruising and that the bruising was not "specific," nor did it form a pattern. The examiner also admitted on cross-examination that Shepard did not have any bruising in the shape of fingertips. He testified that Shepard had only two defensive wounds and that he thought it was odd that Shepard had so few defensive wounds "given the shear [sic] number of injuries on his head and neck."

The examiner explained that because Shepard had significant bloodstains on both the front and back of his shirt, he probably changed positions during the assault. The examiner additionally testified about burst blood vessels in Shepard's left eye that could be the result of being choked, but that the injury to Shepard's neck prevented the examiner from confirming that any pressure was applied there. Finally, the examiner explained that because several injuries could have caused Shepard's death—sharp force injuries, multiple blunt force injuries, or asphyxia—he could not determine which injury actually killed Shepard and therefore he certified the cause of Shepard's death as "complex homicidal violence."

A fingerprint expert testified that three of Thompson's prints—two palm prints and one fingerprint—were found on the bathroom wall. The expert testified that

Flowers's fingerprints were found on a cup in the kitchen sink.

The State also presented evidence that there were two sets of bloody footprints found throughout the house. More specifically, a certified footwear examiner testified that shoe outsole impressions (shoeprints) and fabric impressions (sock prints) were found. Fabric impressions were found on the floor in the north bedroom, the hallway, the bathroom and the southeast bedroom. Shoe outsole impressions were found in the north bedroom, and the bathroom, and these impressions led to the knife block in the kitchen. According to the testimony of a crime lab unit investigator, the fabric impressions were more numerous than the shoe outsole impressions, which were made by Nike Air Force One shoes. Though both Flowers and Thompson wore Nike Air Force One shoes that evening, the State's theory was that the shoe outsole impressions were made by Flowers, and the fabric impressions were made by Thompson.

The footwear examiner testified that he was able to identify the source of a few of the shoe outsole impressions with some certainty. He positively identified five of the shoe outsole impressions found in the north bedroom as being made by Flowers's shoes, which were size 11 Nike Air Force Ones. A "positive identification" means that the examiner excluded all other shoes or objects as the origin of the impression. The examiner also testified that he concluded that one of the shoe outsole impressions found in the kitchen was "possibly made" by Flowers's shoe. Additionally, the examiner testified that there were sock fabric impressions and a shoe sole impression in the bathroom, but he was unable to positively identify the shoe sole impression as belonging to Flowers's shoe. The examiner said that because there was "not enough information,"

he could not say that the print was made by Flowers's shoe "to the exclusion of all others." Finally, while there were both shoe outsole and fabric impressions in the hallway, the examiner was not able to positively identify any of them. The examiner testified that Thompson and Flowers wore Nike Air Force One shoes of a similar size—Flowers wore size 11 and Thompson wore size 10–1/2.

Thompson's boxer shorts and gym shorts were also admitted into evidence. Both shorts had a significant amount of blood on them. Thompson's and Daniels's blood were found on the boxer shorts, while only Daniels's blood was found on the gym shorts.

Other evidence recovered from alley garbage cans near Daniels's home was admitted. This evidence included Daniels's cellular telephone, a pair of rubber gloves, and a black cloth glove. There was blood found on the rubber gloves that when tested indicated a DNA mixture, and the forensic scientist who completed the DNA testing testified that "[t]he predominant profile within this mixture matches Katricia Daniels, and Robert Shepard cannot be excluded from being a contributor." But the scientist was unable to identify who had worn the rubber gloves, as there was no "wearer" DNA—skin cells that are left on an object by handling or wearing the object—in or on the gloves. Blood on the black cloth glove matched Daniels's DNA. Thompson had several cuts on his hand at the time of his arrest.

The homicide unit detective additionally testified that Flowers told him during another interview after his arrest that Thompson threw his bloody socks over a fence toward the freeway after leaving Daniels's home. Flowers also described where Thompson threw the socks. The detective testified that he located the socks in a tree in the area Flowers had told the

police to search. The forensic scientist was able to obtain a partial profile of DNA from the blood on the pair of socks, and the partial profile matched Daniels's DNA. In addition, the scientist testified that he found a DNA mixture inside Thompson's right shoe, and Daniels and Thompson could not be excluded from that mixture.

The forensic scientist also testified that the blood found on the broken knife—both the blade and the handle—matched Daniels's DNA, and that blood found on the intact knife matched the DNA profiles of Daniels, Shepard, and Thompson. Blood found on the golf club matched Daniels's DNA. Additionally the scientist testified that the DNA from material found underneath Daniels's fingernails matched "the Y chromosomal DNA profile obtained from Stafon Thompson and does not match the Y chromosomal DNA profile obtained from Brian Flowers."

The police took pictures of Flowers's entire body after his arrest. In contrast to Thompson, Flowers had no cuts on his hands or other parts of his body. The forensic scientist testified that there was "one spot" of blood on the top of Flowers's left shoe. Another forensic scientist testified that the predominant profile found on this blood sample matched Shepard. The scientist also testified that there was blood on Flowers's T-shirt and shorts that was his own, but the scientist did not further describe the sample. All other testimony indicated that Flowers's clothes and shoes were otherwise free of blood.

One of Daniels's neighbors testified that in the early morning hours of June 12 she saw two young men arguing in the alley behind her home, and she called 911 after observing the argument. There was also testimony that Daniels's purse was found with the strap or lining turned out, in the north bedroom, and someone had searched through paperwork in the north bedroom.

J.W., Daniels's boyfriend, testified that no money was missing from the home. J.W. testified that he knew both Thompson and Flowers from previous visits to his and Daniels's home, but that he was more familiar with Thompson because Thompson visited more often. J.W. testified that he never had any problems with Flowers, but he had trouble with Thompson "[e]very now and then."

Flowers did not testify at his trial or present any other testimony or evidence of his own. The jury found Flowers guilty of four counts of first-degree murder—two counts of first-degree premeditated murder, Minn.Stat. § 609.185(a)(1), and two counts of first-degree murder while committing or attempting to commit aggravated robbery, Minn.Stat. § 609.185(a)(3). The jury also found Flowers guilty of two counts of second-degree intentional murder, a lesser-included offense. The district court sentenced Flowers to two consecutive life terms in prison for the premeditated murder of Daniels and the premeditated murder of Shepard. Flowers filed a direct appeal, claiming that (1) the court violated his Fifth Amendment rights by erroneously admitting into evidence the first statement he gave to the police; (2) the court erred when it failed to instruct the jury on Flowers's theory of defense; and (3) the evidence was insufficient for a finding of guilt.

I.

We first address Flowers's claim that the district court erred when it admitted his first statement into evidence at trial. A police officer must give an individual in custody a *Miranda* warning before interrogating that individual. *See Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *State v. Rosse,* 478 N.W.2d 482, 484 (Minn.1991). If an officer interrogates an individual in

custody without first informing the individual of his rights, statements made during the interrogation generally cannot be introduced into evidence during a later trial of that individual. *See Miranda v. Arizona,* 384 U.S. at 444, 86 S.Ct. 1602; *State v. Rosse,* 478 N.W.2d at 484. In an omnibus hearing before trial, Flowers moved to suppress statements he made during his first interview at the police station on June 13. He asserted that he was in custody during that interview. The State did not dispute that investigators interrogated Flowers during the first interview, but argued that he was not in custody. The district court denied Flowers's motion, concluding that the first interview was a noncustodial interrogation. The court then allowed the State to play a recording of the interview at trial.

On appeal, Flowers argues that the district court erred by concluding that the first interview was noncustodial and therefore violated his Fifth Amendment rights by admitting the statement into evidence. Flowers also argues that he is entitled to a new trial because the erroneous admission of the statement was not harmless beyond a reasonable doubt. The State continues to maintain that Flowers was not in custody during his first interview, and therefore he was not entitled to a *Miranda* warning.

█ It is undisputed that Flowers was interrogated during the first interview, and we consider only whether he was in custody. On review, we give deference to the district court on factual matters, reviewing the court's factual findings for clear error. *State v. Staats,* 658 N.W.2d 207, 211 (Minn.2003). But we make an independent determination regarding whether, under the facts, the individual was in custody. *State v. Wiernasz,* 584 N.W.2d 1, 3 (Minn.1998). In other words, we will make our own determination as to whether Flowers was in custody during

the first interview, giving no deference to the district court's custody determination. *See id.*

█ In determining whether an individual is in custody for purposes of the Fifth Amendment, the test is whether a reasonable person in the individual's situation would have understood that he was in custody. *State v. Miller,* 573 N.W.2d 661, 670 (Minn.1998). If the police have not yet formally arrested the individual, a court must examine all of the surrounding circumstances and evaluate whether a reasonable person in the individual's position would believe he was restrained to a degree associated with a formal arrest. *Miller,* 573 N.W.2d at 670; *Rosse,* 478 N.W.2d at 484.

██ We look to several factors when determining whether an individual is in custody, none of which standing alone is dispositive. *Staats,* 658 N.W.2d at 211. We have said that the following factors indicate custody: the interrogation takes place at the police station, the officer telling the individual that he is a prime suspect, officers restraining the individual's freedom, the individual making an incriminating statement, the presence of multiple officers, and the use of guns. *Id.* The following factors indicate an individual is not in custody: the interrogation takes place at the individual's home, the police expressly inform the individual he is not under arrest, the individual leaves the police station at the close of the interview without hindrance, the questioning is brief, the individual has the freedom to leave at any time, the questioning takes place in an nonthreatening environment, and the individual has the ability to make a phone call. *Id.* at 212.

█ In this case, after Thompson and Flowers learned that investigators wanted to talk to them, they voluntarily called the

investigators and agreed to go to the police station to be questioned. Flowers rode to the station in Simmons's car. Once at the station, the investigators explicitly told Flowers that he was not under arrest and he could leave at any time. The investigators who questioned Flowers were not in uniform and never drew their guns. There were no officers guarding the door to Flowers's interview room. The interview room door was shut during the interview, but one of the investigators said, "[T]he door's not locked, it's just shut for our privacy.... You're here on your own free will." In addition, the investigators behaved courteously, offered Flowers water, and allowed him to use the restroom. The investigators did not tell Flowers that he was a prime suspect in the murder investigation. During this first interview, Flowers told the investigators he left Daniels's home at midnight and that she was unharmed at that time.

Although the interrogation took place at a police station, a factor that indicates custody, several other factors indicate that Flowers was not in custody during the first interview: the investigators did not tell Flowers he was a prime suspect, the investigators did not restrain Flowers's freedom, Flowers did not confess to any crime, two officers questioned Flowers, and the officers did not use guns. *See id.* at 211–12. In addition, the police expressly informed Flowers he was not under arrest and that Flowers had the freedom to leave at any time. *See id.* at 211.

Flowers asserts that two other factors indicate he was in custody. First, Flowers argues that the he was in custody because the first interview was audio and video taped. We have declined to treat recording as indicative of custody because such a rule would discourage the practice of recording noncustodial interviews, a practice we do not require but support.

*See id.* Therefore, Flowers's first argument has no merit. Second, Flowers asserts that he was not allowed to make telephone calls during the first interview, and argues that this fact indicates he was in custody. But Flowers never requested to make or receive a telephone call and the investigators did not prohibit or prevent Flowers from doing so. At most, the investigators did not proactively offer Flowers the opportunity to make a telephone call. Although we have said that allowing an individual to receive a telephone call is indicative of a noncustodial interrogation, *see id.* at 212, we have not said that a failure to offer an individual the opportunity to make a telephone call is indicative of a custodial interrogation. Therefore, the fact that Flowers did not make or receive a telephone call during the first interview does not indicate that the interrogation was custodial.

Our analysis of the factors that point to whether the first interview was custodial or noncustodial indicate that resolving this issue is a close call. But when taken as a whole, the circumstances surrounding Flowers's first interview lead us to conclude that a reasonable individual in Flowers's position would not believe he was restrained to a degree associated with a formal arrest. Therefore, we conclude that Flowers was not in custody when he gave his first statement. Accordingly, we hold that the district court did not violate Flowers's Fifth Amendment rights when it admitted Flowers's first statement into evidence at trial.

## II.

Flowers requested that the district court instruct the jury regarding the crime of aiding an offender after the fact under Minn.Stat. § 609.495 (2008). The State objected to giving this instruction. The court denied Flowers's request because it

determined that the crime of aiding an offender is not a lesser included offense of first-degree murder under Minn.Stat. § 609.04 (2008).

Flowers argues that the district court violated his right to present a defense when it refused to instruct the jury on the crime of aiding an offender under Minn.Stat. § 609.495. Flowers asserts he was entitled to an instruction on aiding an offender because the crime of aiding an offender was his theory of defense, and evidence admitted at trial supported his theory. *See State v. Persitz,* 518 N.W.2d 843, 848 (Minn.1994) ("A party is entitled to an instruction on his theory of the case if there is evidence to support it."). The State maintains that Minnesota law prohibits a district court from giving an instruction on a lesser but nonincluded offense, regardless of whether that offense is a defense. In support of its argument that a lesser, nonincluded offense may not be submitted to the jury, the State cites to *State v. Gisege,* 561 N.W.2d 152 (Minn. 1997).

The State charged the defendant in *Gisege* with attempted first-degree murder and attempted second-degree murder. *Id.* at 155. Near the close of trial, the district court granted the defendant's request to instruct the jury on first-degree assault and the jury found the defendant guilty of that offense. *Id.* The defendant then appealed, arguing that the court erred in instructing the jury on first-degree assault because "the grand jury did not indict him of that offense and because it is not a lesser-included offense of either attempted first-degree murder or attempted second-degree murder." *Id.*

The question before us in *Gisege* was whether the district court erred in granting the defendant's request at the close of trial to "instruct the jury on what the defense classified as the lesser-included charge of first-degree assault." *Id.* We concluded that to answer this question, we needed to address two sub-issues: whether first-degree assault is a lesser-included offense of either attempted first-degree murder or attempted second-degree murder, and, if not, whether the inclusion of the first-degree assault charge was improper. *Id.* As to the first sub-issue, we concluded that first-degree assault is not a lesser included offense of either attempted first-degree murder or attempted second-degree murder. *Id.* at 156. As to the next sub-issue, we held that the inclusion of the lesser charge was improper. *See id.* at 157–58. Citing to the opinion of the U.S. Supreme Court in *Schmuck v. United States,* 489 U.S. 705, 717, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), we explained in *Gisege* that "fairness" required this result. *Gisege,* 561 at 157. In *Gisege,* we expanded our holding from relying on *Schmuck,* we held that a court may not grant a request by either the State or a defendant for an instruction on a lesser but nonincluded offense on the grounds that the nonmoving party would be prejudiced by a lack of notice. *See id.* at 157.

■ Flowers does not contest our holding in *Gisege* or assert that the crime of aiding an offender is a lesser included offense of first-degree murder. Rather, Flowers argues that he was entitled to an instruction on the lesser but nonincluded offense of aiding an offender because it was his theory of defense, and his right to present a defense trumps any prohibition against instructing juries on lesser but nonincluded offenses. The parties disagree, however, as to whether the crime of aiding an offender is a theory of defense and as to whether the prohibition on lesser-but-nonincluded-offense instructions bars a defendant from instructing the jury on his theory of defense which happens to be a lesser but nonincluded crime.

Flowers cites *United States v. Brown*, 33 F.3d 1002 (8th Cir.1994), in support of his assertion that admission to aiding an offender is a defense against the charge of first-degree murder. Flowers argues that his defense against the charge of first-degree murder is that he aided Thompson, an individual he knew had committed a crime, in avoiding arrest, but that he did not actively participate in the crime.

In *Brown*, the issue was whether a defendant charged with armed bank robbery was entitled to an instruction on the crime of accessory after the fact as his theory of defense. *See id.* at 1004. The police had arrested the defendant when he went to a location near some railroad tracks and picked up duffel bags that contained money stolen from the bank and some items used to rob the bank. *Id.* at 1003. At trial, the defendant's theory of defense was that someone else committed the robbery and he was paid to pick up the duffel bags, making him at most an accessory after the fact. *See id.* The district court denied the defendant's request for an instruction on the crime of accessory after the fact. *See id.*

The Eighth Circuit held that the district court should have instructed the jury on the crime of accessory after the fact. *Id.* at 1004. In so holding, the federal court focused on the fact that the State's theory and the defense's theory were inconsistent. The court noted that "[t]he government's theory of the case was that one person had committed the bank robbery and that Brown was that person," while Brown's theory was that he assisted the bank robber after the robbery was completed. *Id.* The court concluded that Brown could not be an accomplice after the fact if he were guilty of armed bank robbery because it would be impossible for him to assist the offender if he was the offender. *See id.* The court said, "[B]eing an accessory after the fact is 'an offense where one knowing that an offense ... has been committed ... assists *the offender* in order to hinder his [or her] apprehension, trial or punishment.'" *Id.* (emphasis in original) (citations omitted) (internal quotation marks omitted). Because Brown's theory was inconsistent with the State's theory of the case, the court held that it was an appropriate theory of defense and should have been made part of the instructions to the jury. *See id.*[1]

Flowers urges us to adopt the Eighth Circuit's reasoning in *Brown* and hold that Flowers was entitled to an aiding an offender instruction. But we conclude that even if we were to adopt *Brown*, Flowers would not be entitled to an aiding an offender instruction because, under the facts and circumstances of this case, aiding an offender could not be a defense to aiding and abetting first-degree murder. The State's theory in this case was that Flowers and Thompson both participated in the murders; both were therefore "offenders" under the State's theory. Because the State's theory is that there were two offenders, it appears that Flowers could have aided an offender—Thompson—and still have been an offender himself. Here, it is not impossible for Flowers to assist the offender if he was himself an offender, as it was in *Brown*. Flowers's theory is not inconsistent with the State's theory and therefore is not a defense to the crime of first-degree murder under the Eighth Circuit's reasoning in *Brown*. Therefore, even if we were to adopt *Brown*, we hold that the district court did not err when it

---

1. Notably, the court in *Brown* did not address whether the crime of accessory after the fact was a lesser, nonincluded offense or whether there is a prohibition against instructions on lesser, nonincluded offenses in federal courts.

refused to instruct the jury on aiding an offender, Minn.Stat. § 609.495.

Because we conclude that aiding an offender is not a defense in this instance under the reasoning in *Brown*, we decline to consider adopting *Brown*, to decide whether aiding an offender may be considered a theory of defense in Minnesota, or to decide whether the prohibition on lesser-but-nonincluded-offense instructions articulated in *Gisege* bars a defendant from instructing the jury on his theory of defense when his defense is a lesser but nonincluded crime.

### III.

 Finally, we address Flowers's contention that the evidence was insufficient to support his conviction of aiding and abetting first-degree murder. Both Thompson and Flowers were charged with first-degree murder and aiding and abetting first-degree murder. At their respective trials, each alleged that the other actually committed the murders. At Flowers's trial, there was substantial evidence offered that Thompson committed the overt acts of murdering Daniels and Shepard, i.e., Thompson clothes were covered in Daniels's and Shepard's blood, his DNA was under Daniels's fingernails, and he had several wounds on his hands and arms. One the other hand, there is much less evidence that Flowers participated in the overt acts of murdering Daniels and Shepard. This fact situation makes this one of the more difficult sufficiency of the evidence cases we have faced; nevertheless, we conclude that there is sufficient evidence to support a conviction of aiding and abetting first-degree murder. When the evidence is viewed in a light most favorable to the State, a jury could have reasonably concluded beyond a reasonable doubt that Flowers aided Thompson in committing the crimes.

 In reviewing a claim of insufficiency of the evidence, "we make a painstaking review of the record," *State v. Brown*, 732 N.W.2d 625, 628 (Minn.2007), "to ascertain[ ] whether, given the facts in the record and the legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged." *State v. Merrill*, 274 N.W.2d 99, 111 (Minn. 1978). We will not disturb a verdict "[i]f the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that [the] defendant was proven guilty of the offense charged." *State v. McCullum*, 289 N.W.2d 89, 91 (Minn.1979) (citation omitted) (internal quotation marks omitted). "We cannot retry the facts, but must take the view of the evidence most favorable to the state and must assume that the jury believed the state's witnesses and disbelieved any contradictory evidence." *Merrill*, 274 N.W.2d at 111.[2]

In this case, the jury found Flowers guilty of "intentionally aid[ing], advis[ing], hir[ing], counsel[ing], or conspir[ing] with or otherwise procur[ing]," Minn.Stat. § 609.05, subd. 1, Thompson to commit the crime of intentional first-degree murder under Minn.Stat. § 609.185(a)(1), (3).[3] In *State v. Gates*, we said that

> [t]o impose liability for aiding and abetting, the state must show that the defen-

---

**2.** Flowers argues that the State presented only circumstantial evidence that Flowers aided and abetted Thompson in committing the murders and that we should apply the standard of review for circumstantial evidence cases. *See State v. Andersen*, 784 N.W.2d 320 (Minn.2010). We disagree. The State presented direct evidence on each element of the offense of aiding and abetting first-degree murder; therefore, we will not apply the standard of review articulated in *State v. Andersen*.

**3.** Minnesota Statutes § 609.185 states in relevant part:

dant played a knowing role in the commission of the crime. We distinguish between, on the one hand, a knowing role in the crime and, on the other hand, mere presence at the scene, inaction, knowledge and passive acquiescence. However, active participation in the overt act that constitutes the substantive offense is not required, and a defendant's presence, companionship, and conduct before and after an offense is committed are relevant circumstances from which the jury may infer criminal intent.

615 N.W.2d 331, 337 (Minn.2000) (citations omitted), *overruled on other grounds by Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Flowers does not dispute that Thompson committed first-degree murder, Minn.Stat. § 609.185(a)(1), (3). It is also undisputed that Flowers was present during the murders. We must therefore determine whether Flowers somehow aided Thompson in the commission of the murders. *State v. Ostrem,* 535 N.W.2d 916, 924–25 (Minn.1995) ("We have previously held that a person's presence can be sufficient to impose liability if it somehow aids the commission of the crime." (citations omitted)). Flowers admitted that he took Daniels's cellular telephone before Shepard was attacked, thereby preventing Shepard from calling for help. While Thompson attacked Daniels, Flowers kept Shepard in the north bedroom, preventing Shepard from assisting his mother or escaping.[4] Further, Flowers also admitted that he left Daniels's home with Thompson after the murders and remained with Thompson for much of the next day. The State presented evidence that corroborated Flowers's admissions, including evidence that Shepard's blood was on Flowers's shoe; evidence of shoe outsole impressions that matched Flowers's in the north bedroom, the bathroom, and leading to the knife block in the kitchen; and evidence that Daniels's cellular telephone was retrieved from a garbage can. From the foregoing facts, viewed in the light most favorable to the State, we conclude that a jury "could reasonably conclude that [the] defendant was proven guilty of the offense charged." *McCullum,* 289 N.W.2d at 91. We therefore hold that the evidence was sufficient to support Flowers's conviction of aiding and abetting Thompson in intentionally causing the deaths of Daniels and Shepard.

Affirmed.

STRAS, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

---

(a) Whoever does any of the following is guilty of murder in the first degree and shall be sentenced to imprisonment for life: (1) causes the death of a human being with premeditation and with intent to effect the death of the person or of another;

. . .

(3) causes the death of a human being with intent to effect the death of the person or another, while committing or attempting to commit burglary, aggravated robbery, kidnapping, arson in the first or second degree, a drive-by shooting, tampering with a witness in the first degree, escape from custody, or any felony violation of chapter 152 involving the unlawful sale of a controlled substance[.]

4. In his statement to the police, Flowers explained that he took Daniels's cellular phone because Thompson told him to and that he kept Shepard in the bedroom because he "didn't want [Shepard] to see his mom." But the jury was free to disbelieve Flowers's explanations for his actions. The record supports a finding that Flowers intentionally committed acts he knew would aid Thompson in committing the murders.