*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-1263**

State of Minnesota,
Respondent,

vs.

Jimmy Lee Morris,
Appellant.

**Filed July 21, 2014
Affirmed
Kirk, Judge**

St. Louis County District Court
File No. 69DU-CR-12-1751

Lori Swanson, Attorney General, James B. Early, Assistant Attorney General, St. Paul, Minnesota; and

Mark S. Rubin, St. Louis County Attorney, Duluth, Minnesota (for respondent)

William M. Ward, Hennepin County Chief Public Defender, Paul J. Maravigli, Assistant Public Defender, Minneapolis, Minnesota (for appellant)


        Considered and decided by Kirk, Presiding Judge; Hooten, Judge; and Willis,

Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment under Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**KIRK**, Judge

On appeal from his convictions of aiding and abetting first-degree criminal sexual conduct, appellant argues that the district court erred by admitting evidence gathered during an un-*Mirandized* police interview and that the prosecutor committed prejudicial misconduct warranting a new trial. We affirm.

## FACTS

During the early morning hours of March 19, 2011, a border-patrol agent saw six men standing around a silver Chrysler Concorde near an apartment building at Fourth Street and Seventh Avenue East in Duluth and took note of the vehicle's Wisconsin license-plate number. From a distance, the agent watched one of the men carry an incapacitated woman from the car toward the building, return to the car, and leave with two other men. Shortly thereafter, the agent encountered Officer Nathaniel Hughes of the Duluth Police Department, told Officer Hughes what he had seen, and provided descriptions of the woman and the car. Officer Hughes then responded to a report of a woman lying in an alley behind 625 East Fourth Street and found S.A., extremely intoxicated, with numerous cuts, scrapes, and bruises. S.A. matched the border-patrol agent's description of the woman who had been carried from the car. An ambulance took S.A. to a hospital, where she told officers she had been sexually assaulted by a group of men and underwent a sexual-assault examination.

At about 1:30 a.m. the next day, Officer Hughes saw the silver Chrysler approaching a freeway entrance ramp in the same area. He followed the car and

conducted a traffic stop on the freeway. Officer Hughes approached the car, told the driver that the car had been seen in the vicinity of a rape the night before, and stated that he wanted to know if the occupants had seen anything or were potentially involved. The driver identified himself as appellant Jimmy Lee Morris and admitted that he did not have a valid driver's license. Officer Hughes verified appellant's identity and found that his license was suspended. As appellant sat in the driver's seat of the Chrysler, Officer Hughes asked him if he was in Duluth the previous night—appellant said he was—and whether he had loaned the car to anyone—appellant said he had not.

After receiving word from his sergeant that the Chrysler would be towed, Officer Hughes asked appellant if he would be willing to sit in the back seat of Hughes's squad car. Appellant agreed, and Officer Hughes put him in the back seat. Officer Hughes gave appellant a ticket for driving after suspension, but did not search him or handcuff him. He also did not give appellant a *Miranda* warning. Officer Hughes told appellant that he was not under arrest, and was free to go, but said he had some additional questions about where the Chrysler had been the night before. Appellant agreed to answer the questions.

In response to Officer Hughes's questions, appellant said that on the previous night he and a friend were in the Chrysler when they encountered a group of men with a woman and stopped to talk with them, then left the area. Officer Hughes asked appellant if he would be willing to provide a DNA sample. Appellant said he would and that he had no reason not to because his DNA would not match anything. Appellant also agreed to ride with Officer Hughes and point out a few relevant locations. Appellant directed

3

Officer Hughes to at least two locations: the friend's house and the place where they had seen the group of men with the woman. Officer Hughes then drove to the police-department parking lot and continued the conversation. When they had finished their conversation, Officer Hughes drove appellant to his home in Superior, Wisconsin, and dropped him off there.

At the time appellant initially agreed to answer Officer Hughes's questions, Hughes's squad car was parked on the side of the freeway, and appellant was sitting in the back seat. Officer Hughes later testified that if appellant had declined to speak with him at the outset, he would not have let appellant out of the car because it is illegal and unsafe to walk on the side of the freeway, and he would not have let appellant return to the Chrysler because his license was suspended. Instead, he would have told appellant that he could call for a ride or would have given him a ride to a safe place. But appellant did not call for a ride or ask to do so, and Officer Hughes did not inform him of that option. During the interview, as they drove to the locations appellant had identified, appellant never asked to get out of the car. Officer Hughes testified that if appellant had done so, he would have let him out near a gas station or the friend's house because those would be safe places to walk.

Police later linked DNA evidence recovered during the sexual-assault examination of S.A. to appellant, and in May 2012, respondent State of Minnesota charged him with first-degree criminal sexual conduct, in violation of Minn. Stat. § 609.342, subd. 1(f)(1). The state amended the complaint in February 2013, adding count two: aiding and abetting first-degree criminal sexual conduct, in violation of Minn. Stat. § 609.342, subd. 1(e)(i)

4

(use of force), and count three: aiding and abetting first-degree criminal sexual conduct, in violation of Minn. Stat. § 609.342, subd. 1(e)(ii) (impaired, incapacitated, or helpless victim).

At a contested omnibus hearing, appellant moved to suppress information gathered during the un-*Mirandized* interview. The district court denied the motion, finding that the interview "was not a custodial interview and was not subject to *Miranda*." After a five-day jury trial in February 2013, the jury deadlocked on count one, and the district court declared a mistrial as to that count. The jury returned guilty verdicts on counts two and three. The district court accepted the guilty verdicts, adjudicated guilt on both, sentenced appellant to 173 months for count two, and imposed no sentence for count three. This appeal follows.

**D E C I S I O N**

**I. Appellant was not in custody during the interview.**

"The issue of whether a suspect is 'in custody' and therefore entitled to a *Miranda* warning 'presents a mixed question of law and fact qualifying for independent review.'" *State v. Sterling*, 834 N.W.2d 162, 167 (Minn. 2013) (quoting *Thompson v. Keohane*, 516 U.S. 99, 102, 116 S. Ct. 457, 460 (1995)). We review the district court's "findings of historical fact relating to the circumstances of the interrogation" for clear error, but we "make[] an independent review of the [district] court[']s determination regarding custody and the need for a *Miranda* warning." *Id.* at 167–68 (quotation omitted). Because the facts of this case are not disputed, the task before us is to independently apply the law to

the facts to decide whether the district court erred by ruling that appellant was not in custody at the time of the interview.

The United States Constitution and the Minnesota Constitution both provide that "[n]o person" shall "be compelled in any criminal case to be a witness against himself." U.S. Const. amend V; Minn. Const. art. 1, § 7. In *Miranda v. Arizona*, the United States Supreme Court held that the constitutional protection against self-incrimination attaches when a defendant is subjected to "custodial interrogation," meaning "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966). "Subsequent [United States Supreme Court] decisions have narrowed this language." *State v. Rosse*, 478 N.W.2d 482, 484 (Minn. 1991). In *Rosse*, the Minnesota Supreme Court expressly adopted a narrower custody test than that stated by the United States Supreme Court. *Id.* (citing *Berkemer v McCarty*, 468 U.S. 420, 440–441, 104 S. Ct. 3138, 3150–51 (1984)). "[That] test is whether a reasonable person under the circumstances would believe that he or she was in police custody of the degree associated with formal arrest. The test is not whether a reasonable person would believe he or she was not free to leave." *State v. Champion*, 533 N.W.2d 40, 43 (Minn. 1995) (citation omitted). In the 19 years since its *Champion* decision, the supreme court has restated and applied the narrower custody test many times. *See, e.g.*, *Sterling*, 834 N.W.2d at 168; *State v. Scruggs*, 822 N.W.2d 631, 637 (Minn. 2012); *State v. Thompson*, 788 N.W.2d 485, 491 (Minn. 2010).

When no formal arrest has occurred, we "examine all of the surrounding circumstances" to determine whether a person was in custody. *State v. Flowers*, 788 N.W.2d 120, 129 (Minn. 2010). The supreme court summarized factors indicating custody and lack of custody, in *State v. Staats*, 658 N.W.2d 207, 211–12 (Minn. 2003), and reiterated them in *Flowers*, 788 N.W.2d at 129. As applicable to the facts of this case, the factors listed in *Staats* and *Flowers* include: (1) the location where the questioning occurs, such as at a police station, in the individual's home, or some other place, and whether the location is a threatening environment; (2) the duration of the interview; (3) statements made by the officers, including whether they tell the individual he or she is a suspect, or that he or she *is not* under arrest; (4) whether the individual makes an incriminating statement; (5) whether the individual is physically restrained or actually free to leave at any time; (6) the number of officers present, and whether they have their weapons drawn; (7) whether the individual is freely permitted to leave at the end of the interview; and (8) whether the individual is free to make a phone call during the interview. *See Flowers*, 788 N.W.2d at 129; *Staats*, 658 N.W.2d at 211–12. No single factor is dispositive on its own. *Flowers*, 788 N.W.2d at 129; *Staats*, 658 N.W.2d at 211.

### A.    Location and environment

Interrogation in a police station tends to indicate custody, and interrogation at a person's home tends to indicate a lack of custody. *Flowers*, 788 N.W.2d at 129; *Staats*, 658 N.W.2d at 211–12. If those two environments are regarded as the opposite ends of a continuum, the back seat of a squad car falls closer to the police-station end of that

7

continuum. But the supreme court has held that the fact that questioning occurs while the subject is in the back seat of a patrol car does not necessarily make an interrogation custodial. *State v. Herem*, 384 N.W.2d 880, 883 (Minn. 1986). And interrogations that occurred inside law-enforcement facilities have also been found non-custodial. *E.g.*, *State v. Marhoun*, 323 N.W.2d 729, 731 (Minn. 1982) (holding that statements given at a police station and at the Bureau of Criminal Apprehension were not custodial when defendant went to those locations voluntarily and was informed that he was free to leave). Appellant has not argued that the location was a threatening environment, and the record includes no evidence to that effect. While it would be natural for a person in appellant's circumstances to be concerned about the implications of talking with a police officer, the fact that appellant voluntarily got into the squad car suggests he was not overawed by what the United States Supreme Court has called "the aura of authority surrounding an armed, uniformed officer." *Berkemer*, 468 U.S. at 438, 104 S. Ct. at 3149. Considering all these facts, we conclude that location and environment weigh marginally against the district court's ruling that appellant was not in custody.

### B. Duration

Officer Hughes testified that he stopped appellant at about 1:30 a.m., but he did not indicate what time appellant got into his squad car, what time he dropped appellant off at his home, or how long they were in the car together. The district court made no finding about the duration of the encounter. In *State v. Seekon*, we upheld the district court's determination that a *Miranda* warning should have been given when a truck was stopped as part of a felony investigation and the passenger was questioned in the back of

a squad car, even though the duration of the encounter was only about 15 minutes. 392 N.W.2d 624, 625, 627 (Minn. App. 1986), *review denied* (Minn. Oct. 17, 1986). Although the facts in the record provide scant basis for review, we conclude that duration also weighs marginally against the district court's decision.

### C. Statements made by police

Officer Hughes told appellant at the outset that he was free to go and that he was not under arrest. The state argues that we should weigh this factor more heavily than others because the Eighth Circuit appears to have done so. *See United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004) (identifying such statements as "powerful evidence that a reasonable person would have understood that he was free to terminate the interview"). We reject the approach the state suggests because Eighth Circuit cases are not binding on this court and because we find no authority showing that Minnesota appellate courts have followed *Czichray*. Nonetheless, a reasonable person, told by an officer that he is not under arrest and is free to go, would most likely believe he was not in custody. Additionally, Officer Hughes did not tell appellant that he was a suspect. We therefore conclude that this factor weighs in favor of the district court's ruling.

### D. Statements made by appellant

There is some indication in the record, outside of the omnibus testimony, that appellant told Officer Hughes that he was driving the Chrysler around Duluth on the night before the sexual assault. This statement may have implicated appellant for driving after suspension, but appellant made no inculpatory statements about the sexual assault. To the contrary, he indirectly asserted his innocence by telling Officer Hughes he had no

9

reason to resist a DNA test because his DNA would not match. We conclude that this factor weighs in favor of the district court's decision that appellant was not in custody.

### E.    Physical restraints and freedom to leave

When the interview began, appellant was seated in the back seat of Officer Hughes's squad car on the side of the freeway. The district court noted that appellant could not have opened the squad car's rear doors from the inside, and Officer Hughes testified that he would not have let appellant leave at that point because it is unsafe and illegal to walk along the freeway. These restrictions on appellant's freedom would weigh against the district court's decision except that there were legitimate non-custody reasons for them, namely, it is unsafe and illegal to walk along the freeway. Those restrictions apply to everyone, and not only to individuals who are in police custody. And once Officer Hughes left the freeway, the balance shifted so that this factor weighs in favor of the district court's decision. Officer Hughes testified that if appellant had terminated the interview or asked to get out of the car, he would have dropped appellant off at a safe location. Under the unique facts of this case, appellant's inability to leave the scene at the beginning of the interview was based on safety and legality, not custody. And once the car was in a safe location, appellant was free to leave, although he did not ask to do so. We therefore conclude that this factor weighs in favor of the district court's ruling that appellant was not in custody during the interview.

### F.    Number of officers and use of weapons

The reasoning behind these factors seems to be that the presence of multiple officers or a show of force suggests willingness to use force to keep the subject where he

is, which strengthens the inference that the subject is in custody. *See Flowers*, 788 N.W.2d at 130 (noting that during an interview deemed noncustodial, there were no officers guarding the door of the interview room); *Rosse*, 478 N.W.2d at 486 (concluding interrogation was custodial where subject was not handcuffed, but was seated in a car in the presence of several officers who had confronted her with guns drawn, and several other indicia of custody were present). Because Officer Hughes was the only officer present and never drew his weapon, we conclude that these factors weigh in favor of the district court's decision.

### G. Freedom to leave after the interview

Appellant was not only free to leave after the interview, but Officer Hughes actually drove him home. This factor supports the district court's conclusion that appellant was not in custody.

### H. Freedom to make phone calls

The record does not indicate whether appellant had a cell phone on his person during the interview, but Officer Hughes testified that he would not have prevented appellant from making a phone call. We conclude that the facts are not sufficient for us to weigh this factor, and we therefore consider it neutral.

To summarize our independent analysis, location and duration weigh marginally against the district court's decision. Officer Hughes's statements to appellant, appellant's statements, and all the other factors weigh in favor of the district court's decision, except for freedom to make phone calls, which we consider neutral. We therefore conclude that the district court did not err by finding that appellant was not in custody during the

interview. Because he was not in custody, no *Miranda* warning was required. We accordingly affirm the district court's decision to deny appellant's suppression motion.

## II. Appellant's prosecutorial-misconduct claims lack merit.

Appellant asserts that the prosecutor committed misconduct warranting a new trial by eliciting vouching testimony and vouching for S.A. during closing argument, and by accusing appellant of tailoring his testimony to fit what he learned from observing the testimony of other witnesses.

Vouching testimony occurs when one witness expresses an opinion about whether another witness is telling the truth. *State v. Ferguson*, 581 N.W.2d 824, 835 (Minn. 1998). Elicitation of vouching testimony is a type of attorney misconduct in which an attorney asks questions that prompt a witness to opine about whether another witness is telling the truth, often by asking the first witness if the second witness was lying. *See State v. Mayhorn*, 720 N.W.2d 776, 788 (Minn. 2006) (acknowledging that there is no "blanket prohibition" on "were they lying" questions, but holding that under the facts of the case, the prosecutor committed misconduct by posing such questions); *State v. Pilot*, 595 N.W.2d 511, 516 (Minn. 1999) (discussing the impropriety of "were they lying" questions).

Appellant argues that the prosecutor "committed misconduct" by "elicit[ing] vouching testimony" and asserts that the prosecutor "delv[ed] into whether two police officers . . . believed [S.A.] truthfully reported a rape." We reject this argument because we conclude that none of the disputed testimony constituted vouching.

12

The first statements appellant challenges, from the direct examination of Duluth Police Officer Jacob Peterson, concern the officer's interactions with S.A. at the hospital. After Officer Peterson described S.A.'s state of intoxication and how the interview was frequently interrupted by medical staff, the prosecutor questioned Officer Peterson as follows:

> Q: [W]as [S.A.] having trouble tracking and recalling events?
> A: She was, yes.
> Q: Was the story—was she able to tell the story in a chronological fashion?
> A: No.
> Q: Did she seem uncertain about the things that she was saying?
> A: Yes.
> Q: And did some of that seem to be due to her level of intoxication?
> A: Yes.

Appellant characterizes this testimony as an elicitation of vouching testimony because the prosecutor got Officer Peterson "to assert that any uncertainty was due to intoxication." We disagree. Officer Peterson did not express an opinion about whether S.A. was telling the truth or lying. Instead, he expressed an opinion about whether her state of intoxication affected her ability to tell the story in a clear, chronological fashion.

The second disputed section of testimony is also from the direct examination of Officer Peterson. In this testimony, Officer Peterson described S.A.'s graphic statements and her difficulty answering his questions.

> Q: Okay. Did—so [S.A.] told you, um, quote, "They made me f--- all of them"; is that true?
> A: Yes.
> Q: Um, did she explain that?

13

A:      She did not. Again, I tried asking follow-up questions and she was unable to—to provide any more answers.

Q:      Same question about the statement, "They all made me give them blow jobs," did she explain that at all?

A:      Ah, she did elaborate, saying that she had provided oral sex to one of the individuals in the alley, and then when we began to talk about the vehicle, she also said that she performed oral sex on one of the individuals in the backseat of the car.

Q:      Did she tell you or indicate to you whether any of this sexual activity was consensual?

A:      She did not specifically say, no.

Q:      Okay. Were you able to tell from any of the context or anything else that she told you?

A:      Based upon her crying and generally how upset she was, I inferred that it was indeed not consensual.

Appellant asserts that Officer Peterson's statement, "I inferred that [the sexual contact] was indeed not consensual," constitutes vouching testimony. But that statement is not an expression of Officer Peterson's opinion regarding S.A.'s truthfulness or credibility. Instead, it is a statement of Officer Peterson's conclusion about the nature of the sexual contact, based on evidence provided by his own observations and S.A.'s statements, including her repeated use of the phrase "they *made* me." (Emphasis added.) The prosecutor did not ask whether Officer Peterson thought S.A. was being truthful when she made those statements, and Officer Peterson did not express an opinion about her truthfulness.

The third disputed section of testimony is from the redirect examination of Duluth Police Investigator Christopher Lofstuen. On direct examination, Investigator Lofstuen testified that S.A. told him "somebody was forcing her to perform oral sex." On cross-examination, defense counsel highlighted the fact that Investigator Lofstuen's report did

14

not include the word "forced." On redirect, the prosecutor elicited Investigator Lofstuen's acknowledgement that the word "forced" was not in his report, and this exchange followed:

> Q: Okay. Um, is that your recollection that [S.A.] was telling you that this was—encounter was forced?
> A: If she didn't say that as a quote, I mean, the—that was the—the gist of the whole—you know, I was—I mean, I was there to investigate a sexual assault so, um, yeah, I couldn't tell you right now, two years later, if she said that word exactly . . . .
> Q: The—in any event, the—the scope and the understanding of the conversation is that you were there to investigate a sexual assault?
> A: Yes.
> Q: And that would be something that was done against [S.A.]'s will?
> A: Yes.

Appellant asserts that the prosecutor elicited vouching testimony by getting Investigator Lofstuen to testify about the "gist" of S.A.'s story, and his own "understanding" that sex was forced. This assertion fails for the same reason as the other two: the witness did not express, and the prosecutor did not ask for, an opinion about whether S.A. was telling the truth. Instead, Investigator Lofstuen stated a conclusion he reached based on evidence from S.A.'s statements. On direct examination, Investigator Lofstuen testified that S.A. told him she had been "sexually assaulted in an alley," and "sexually assaulted in a bathroom." The prosecutor never asked Investigator Lofstuen for, and he never offered, his opinion about the veracity of those reports.

Appellant's second prosecutorial-misconduct claim is that the prosecutor vouched for S.A.'s credibility during closing argument. Vouching by counsel occurs when

15

counsel expresses a personal opinion as to a witness's credibility, or implies a guarantee of a witness's truthfulness. *State v. Lopez-Rios*, 669 N.W.2d 603, 614 (Minn. 2003). Vouching by counsel is particularly problematic when done by a prosecutor, because the jury may regard the prosecutor's opinion as the opinion of the state. *See State v. Cole*, 240 Minn. 52, 58, 59 N.W.2d 919, 922 (1953) (holding that "it is improper for a prosecuting attorney in his closing argument, after emphasizing his role as representative of the state, to offer his own opinion as evidence tending to prove defendant's guilt"). But it is not improper for a prosecutor to argue credibility of witnesses, provided that the argument is based on evidence and the law, and not on the prosecutor's opinion. *E.g.*, *State v. Everett*, 472 N.W.2d 864, 870 (Minn. 1991) (holding that prosecutor's closing-argument comments were not improper when he urged the jury to consider the witness credible based on his demeanor during his testimony).

Appellant's specific argument is that the prosecutor "used a substantial portion of his [closing argument] rebuttal to tell the jury repeatedly that [S.A.] was credible," "repeatedly asserted that [S.A.] would not lie," and "vouch[ed] for [S.A.] as a credible person who did not lie." Appellant does not identify particular statements from the rebuttal, but apparently objects to the following statement:

> [Defense counsel] spoke that [S.A.] made a bad decision and made a number of bad decisions, getting intoxicated, getting involved with her therapist, peripheral issues, he says, and the Defense argues that this makes her not believable. Doesn't that make her more believable in a way? If she was going to come in here and lie to you, why didn't she make up a better story? If she's going to come in here and lie to you, why didn't she just tell you, that's the guy sitting right there, I remember him? She didn't do that[.] She

16

told you, looks like the profile of the driver but I'm not sure[.] If she is so incredible, why didn't she make up a more graphic or gruesome story, like, say, somebody put a gun to my head?

Look at all the things she did tell you about herself, these things that were quite revealing[.] She did tell you she drank too much[.] She relapsed[.] She smoked marijuana with her therapist, and she put herself in a vulnerable position. She came in here and told that to you all[.] Does that sound like someone who's lying or just laying out the facts?

We reject appellant's claim because this statement does not reflect the prosecutor's opinion of S.A.'s credibility. Instead, it is an argument that the jury should believe her testimony because it included internal indicia of credibility. We therefore conclude that the prosecutor did not improperly vouch for S.A.

Appellant's final prosecutorial-misconduct claim is that the prosecutor accused appellant of tailoring his testimony to fit what he learned from hearing the testimony of other witnesses. He points to a particular portion of the prosecutor's closing-argument rebuttal. Appellant did not make a contemporaneous objection.

Because appellant did not object, we review his claim for plain error. *State v. Davis*, 735 N.W.2d 674, 681 (Minn. 2007). Under that standard, "[a]n error is plain if it is clear or obvious, and usually this is shown if the error contravenes case law, a rule, or a standard of conduct." *Id*. (quotations omitted). Arguments that a defendant tailored his testimony to fit evidence presented at trial implicates a defendant's right to be present at trial, which is protected by the Confrontation Clause of the Sixth Amendment to the United States Constitution. *Id*. Minnesota appellate courts have repeatedly held that in the absence of specific evidence of tailoring, it is misconduct for a prosecutor to argue

17

that tailoring occurred. *Davis*, 735 N.W.2d at 681–82; *State v. Swanson*, 707 N.W.2d 645, 657–58 (Minn. 2006); *State v. Ferguson*, 729 N.W.2d 604, 616–17 (Minn. App. 2007), *review denied* (Minn. June 19, 2007).

The challenged section of the rebuttal argument reads as follows:

> [Defense counsel] also talked about [appellant's] testimony saying that this was a consensual act, but remember, he didn't say that at first[.] When you are considering testimony, something important to remember and important to think about is, what did he know when he said what he said? What did the person know when they said what they said?
>
> Remember, he made multiple statements to Officer Hughes and the quote is, He continually denied any involvement other than giving [S.A.] a ride[.] He continually denied that his DNA would be matched against any of the DNA collected from the sex assault kit[.] What did he know when he said what he said? What did he know when he said that? Not much[.] His DNA had not been recovered yet[.] His DNA had not been analyzed by the crime lab yet[.] His DNA had not been matched to the known sample he gave[.] What did he know when he said what he said? Didn't happen[.] Wasn't me[.] Not going to find any evidence[.]
>
> Now, his testimony is that, "I told Officer Hughes that I had consensual sex with her and of course you'll find my DNA on her[.]" What does he know when he said what he said? And does that statement, that idea, even make sense, in light of all of the other evidence in the case? We have an officer investigating an incident of criminal sexual conduct[.] He finds the vehicle the very next day, speaks with a person who says, yes, I did have sex with her and you're going to find my DNA, and the officer gives him a ride home[.] What did he know when he said what he said? What did he know when he said what he said in court? You gotta explain how the DNA got there, so now the testimony is that it was consensual.

Appellant's claim fails because the relevant rule bars tailoring arguments only when there is no evidence that tailoring actually occurred. Here, there is ample evidence

of tailoring. During the trial, the jury heard testimony from Officer Hughes about appellant's statements during the squad-car interview. The prosecutor summarized those statements in his closing-argument rebuttal and urged the jury to compare them to appellant's trial testimony. The statements appellant made in the squad car were inconsistent with his trial testimony, providing clear evidence of tailoring. This case is therefore like *Ferguson*, in which this court held that because the defendant's "account of the events changed significantly as the investigation progressed," the prosecutor "had evidence of tailoring and could legitimately point out changes in [the defendant's] story." 729 N.W.2d at 617.

We conclude that because there was clear evidence of tailoring, the prosecutor's assertion that appellant tailored his trial testimony did not contravene "case law, a rule, or a standard of conduct." *See Davis*, 735 N.W.2d at 681 (quotation omitted). There was therefore no plain error and no prosecutorial misconduct.

**Affirmed.**