STATE of Minnesota, Respondent,

v.

Adam Lee STERLING, Appellant.

No. A12–0073.

Supreme Court of Minnesota.

July 24, 2013.

Lori Swanson, Attorney General, Saint Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Linda M. Freyer, Assistant County Attorney, Minneapolis, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Saint Paul, MN, Melissa Sheridan, Assistant Appellate Public Defender, Eagan, MN, for appellant.

## OPINION

PAGE, Justice.

Appellant Adam Lee Sterling was found guilty after a jury trial of one count of first-degree premeditated murder in violation of Minn.Stat. § 609.185(a)(1) (2012), and one count of second-degree murder in violation of Minn.Stat. § 609.19, subd. 1(1) (2012). As a result of his conviction of first-degree premeditated murder, Sterling was sentenced to life in prison without the possibility of release. In this direct appeal, Sterling raises two issues: (1) whether the trial court erred as a matter of law in denying his motion to suppress statements he made to police because he was in custody at the time the statements were made and had not received a *Miranda* warning; and (2) whether the evidence is insufficient to support his conviction. In his pro se brief, Sterling also makes a number of assertions that he claims are probative of his innocence. Because we conclude that any error in admitting Sterling's statements to police was harmless beyond a reasonable doubt, and that the evidence is sufficient to support Sterling's conviction, we affirm.

This case arises from the October 2010 murder of Leo Kohorst. At trial, the State's theory was that Sterling beat Kohorst to death in the early morning hours of October 17, 2010. Sterling's defense focused on the lack of direct evidence that he [1] killed Kohorst and thus that the State failed to prove his guilt beyond a reasonable doubt. At trial, Sterling did not testify or present any witnesses on his behalf.

The State presented the following evidence. Kohorst, a student at the University of Minnesota, lived in a house in Minneapolis, which he owned with his parents. Kohorst rented rooms in the house to Sterling, Jason Boatwright, and Alexis Mercado. A fourth tenant, Nikki Norman, was in the process of moving out of the house on the weekend that Kohorst was killed. Sterling's room was on the main floor of the house. Boatwright and Mercado occupied two of the three rooms on the second floor. The only bathroom in the house was on the second floor. Kohorst slept in the living room on a futon because he was remodeling the basement. The front of the house had an enclosed porch with an exterior door that locked and an interior door to the house with a glass pane.

At the time of Kohorst's death, he and the tenants were having problems with Sterling. According to Boatwright, Kohorst called a tenant meeting one week before he was murdered to address Sterling's disrespectful behavior—namely, eating others' food and smoking in the house. Boatwright claimed that Sterling reacted to the accusations by saying "that where he comes from, he does what he wants to." After the meeting, Sterling's behavior briefly improved, but got worse throughout the week. Kohorst's mother, Barbara, testified that one week before the murder,

---

1. During trial court proceedings, Sterling is referred to using both male and female pronouns. Sterling is currently incarcerated at an adult male correctional facility. On that basis, and for ease of discussion, Sterling will be referred to throughout this opinion using male pronouns.

Kohorst told her that he was planning to have a meeting with the tenants to address problems in the house. A text message sent from Kohorst's cell phone to Boatwright's cell phone on October 16 stated: "[I] talked to [Sterling], [I'm] giving [him] one last chance, but [he] knows any more shit and [he's] out. [I'll] need solid proof to end [his] lease, though."

Kohorst spent the afternoon of October 16 working on the basement-remodeling project with his parents. That evening, Kohorst went to a concert, returning to the house between 11 p.m. and 12 a.m. Investigators later discovered that a text message was sent from Kohorst's phone to a phone belonging to M.J. at 11:26 p.m. on October 16. Kohorst also posted a message on Facebook at 12:12 a.m. on October 17 using the Internet connection in his house. Boatwright, who was at home when Kohorst returned, briefly spoke with Kohorst in the living room before Kohorst said he was ready to go to bed. At that time, the record indicates that Sterling was in his room with his door closed. Mercado was not present in the house when Kohorst returned from the concert. After Kohorst said he was ready to go to bed, Boatwright locked the front door, took a shower, and went to his room where he browsed Facebook, watched television, and talked on his phone wearing earphones with the door shut. Boatwright could not remember whether he locked the back door before going to his room.

Boatwright testified that approximately an hour to an hour and a half after he went to his room, he heard loud voices and what sounded like the interior front door slamming shut. He went downstairs and noticed that both front doors were ajar. Although the lights were off on the first floor, Boatwright could see Kohorst's silhouette on the futon and hear Kohorst making what Boatwright thought was a snoring sound, although he had never heard Kohorst make such a sound. Boatwright called Kohorst's name, but Kohorst did not respond. He then closed both front doors, locked the exterior door, and returned to his room. Twenty minutes later, Boatwright heard high heels clicking up the stairs, which was a sound he commonly associated with Sterling. The shower turned on for ten minutes before Boatwright heard high heels clicking down the stairs. Fifteen minutes later, Boatwright heard someone yelling from the first floor. Going to investigate, he reached the middle of the staircase when he saw Sterling standing approximately eight feet away from Kohorst's body and saw blood covering the living room wall. Sterling said, "Something happened to Leo! We should call the police." Boatwright retrieved his cell phone and called 911. While on the phone, Boatwright walked downstairs and shook Kohorst's foot, but Kohorst did not respond. After paramedics and police arrived, Mercado returned home.

Upon their arrival at the house, the police found Kohorst's body lying on a futon in the living room covered with a blanket. There was blood spatter on the walls, curtains, furniture, television, ceiling fan, and ceiling, as well as soft tissue on the back of the futon and around Kohorst's head. No bloodstains were found outside of the living room and no bloody footprints were found in the house. Based on the amount of blood and the pattern of blood, the police initially thought that Kohorst had been the victim of a shotgun blast, but later concluded that his injuries were the result of blunt force trauma. Police found no signs of a forced entry and initially believed that there were no items missing from the house.

As part of the police investigation, Sterling, Boatwright, and Mercado were taken

in separate squad cars to the Minneapolis Police Department Homicide Unit offices for questioning. Sterling arrived at the Homicide Unit shortly before 3:30 a.m. After his arrival, Sterling was questioned off and on by Sergeants Robert Dale and DeChristopher Granger over a period of almost 11 hours. Roughly 9–1/2 hours into the questioning, the officers arrested Sterling and read the *Miranda* advisory to him for the first time.

Physical evidence introduced at trial included a pair of high-heeled sandals that the police recovered from Sterling's room that were covered in a mist of Kohorst's blood. A crime scene investigator with the Minneapolis Police Department testified that the size of the blood particles on the high heels suggested they were in the proximity of a forceful-impact blood-spattering event, such as a beating. A forensic scientist with the Minnesota Bureau of Criminal Apprehension also testified that the blood spatter on the high heels was consistent with blood spatter caused by a beating and was not consistent with transfer stains. There was no blood found on the insoles of the high heels, which the State suggested was an indication that the high heels were being worn at the time the blood was deposited on them. A swab of blood from Sterling's left hand matched Kohorst's DNA. Blood on the shower curtain in the bathroom also matched Kohorst's DNA. Swabs taken from Boatwright's hands did not test positive for blood.

The State also introduced a green leopard-print nightgown and a black-and-cream-colored jacket and shawl recovered from Sterling's room. No blood was found on these items. Although it initially appeared that nothing was missing from the house, investigators were unable to locate a green skirt and black leggings, which, according to Kohorst's mother, Sterling

had been wearing on October 16. Additionally, the police later learned from Boatwright that a claw hammer that Kohorst had been using during the remodeling project was missing from the house. At trial, the State introduced a claw hammer that, according to Boatwright, was an "exact replication" of the missing hammer. Investigators never found the actual murder weapon.

Kohorst's autopsy established that there were at least 19 paired puncture wounds to his left temple and the back of his head, some of which pierced his skull and punctured his brain. The wounds were consistent with having been made by the end of a claw hammer similar to the one that was introduced at trial. In addition to the puncture wounds, Kohorst's nose was fractured, there were multiple lacerations on his forehead, one of his eyes was bruised, and he had multiple defensive wounds on his left hand. According to the medical examiner, the cause of Kohorst's death was either blood loss or injury to his brain resulting from blunt force trauma. The medical examiner also testified that Kohorst's end-of-life breathing may have sounded like snoring.

## I.

 We now turn to Sterling's claim that the trial court erred as a matter of law in denying his motion to suppress statements he made to police before he received a *Miranda* warning. The issue of whether a suspect is "in custody" and therefore entitled to a *Miranda* warning "presents a mixed question of law and fact qualifying for independent review." *Thompson v. Keohane,* 516 U.S. 99, 102, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). "[A]n appellate court reviews a trial court's findings of historical fact relating to the circumstances of the interrogation pursuant to the clearly erroneous test but makes

an independent review of the trial courts determination regarding custody and the need for a *Miranda* warning." *State v. Wiernasz,* 584 N.W.2d 1, 3 (Minn.1998) (footnote omitted). We grant " 'considerable, but not unlimited, deference to a trial court's fact-specific resolution of such an issue when the proper legal standard is applied.' " *State v. Staats,* 658 N.W.2d 207, 211 (Minn.2003) (quoting *State v. Champion,* 533 N.W.2d 40, 44 (Minn.1995)).

The Fifth Amendment to the United States Constitution provides that an accused has the right to be free from compelled self-incrimination. As a safeguard for this right, the United States Supreme Court has held that statements made by a suspect during a "custodial interrogation" are admissible only if the police provided a *Miranda* warning before the statements were made. *State v. Thompson,* 788 N.W.2d 485, 491 (Minn.2010) (citing *Miranda v. Arizona,* 384 U.S. 436, 444–45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

 We have said that an interrogation is custodial if, based on the surrounding circumstances, a reasonable person "would believe that he or she was in police custody [to] the degree associated with formal arrest." *Champion,* 533 N.W.2d at 43. "The test is not whether a reasonable person would believe he or she was not free to leave." *Id.* While no single factor is determinative, there are a variety of factors that may combine to indicate that an individual is in custody:

> (1) the police interviewing the suspect[ ] at the police station; (2) the suspect being told he or she is a prime suspect in a crime; (3) the police restraining the suspect['s] freedom of movement; (4) the suspect making a significantly incriminating statement; (5) the presence of multiple officers; and (6) "a gun pointing at the suspect."

*State v. Vue,* 797 N.W.2d 5, 11 (Minn.2011) (quoting *Staats,* 658 N.W.2d at 211). Certain factors may also indicate that a suspect is not in custody:

> (1) questioning the suspect in his or her home; (2) law enforcement expressly informing the suspect that he or she is not under arrest; (3) the suspect's leaving the police station without hindrance; (4) the brevity of questioning; (5) the suspect's ability to leave at any time; (6) the existence of a nonthreatening environment; and (7) the suspect's ability to make phone calls.

*Id.* If an interrogation is noncustodial at its outset and no circumstances change, then the interrogation remains noncustodial. *See id.*

 Before trial, Sterling moved to suppress statements he made to the police during an interrogation that took place at the Minneapolis Police Department Homicide Unit on October 17. Sterling contended that suppression was required because he was in custody when he made the statements and had not received a *Miranda* warning. Sterling also argued that, once he was given a *Miranda* warning, the police officers failed to honor his request for counsel.

The trial court granted Sterling's motion to suppress the statements he made after receiving the *Miranda* warning because the court concluded that the police had failed to honor Sterling's unambiguous request for counsel. However, the court denied the motion with respect to Sterling's pre-*Miranda* statements, concluding that they were admissible because Sterling was not in custody at the time they were made. In so concluding, the trial court made the following findings with respect to the pre-*Miranda* warning portion of Sterling's interrogation:

> • Sterling, Boatwright, and Mercado "were not handcuffed, placed under

arrest, or forced to accompany police by coercive means" when they were brought to the Homicide Unit to be interviewed.

- During the early stage of the investigation, police believed "that the fatal injury was caused by a shotgun" and did not suspect that the housemates were involved in Kohorst's death.
- "During the course of [Sterling's] interview, there were many exchanges regarding his impatience, but also his willingness to remain and continue talking to detectives."
- "[T]he interview continued in a manner consistent with the investigators [sic] intent to obtain any useful information from the witnesses.... The witnesses were ... informed that they were being interviewed for evidence gathering purposes."
- "Throughout the majority of the initial interview the doors were left unlocked and [Sterling] was encouraged to knock on the door if he needed anything."
- Investigators eventually decided to read Sterling his *Miranda* rights "[b]ased on several conflicting statements by [Sterling], as well as additional forensic evidence discovered during the interviews."

Based on its findings, the trial court concluded that "the circumstances surrounding the initial interview of [Sterling] did not amount to a coercive, custodial interrogation."

We first note that Sterling does not challenge the trial court's findings of fact. Moreover, our review of the record satisfies us that the trial court's factual findings are well-supported by the record. Sterling argues, however, that the trial court's conclusion that his interrogation was not custodial is erroneous. In support of this argument, Sterling relies on the following

additional facts: he was frisked at the scene and placed in a separate patrol car from his housemates; he was driven by police to the offices of the Minneapolis Police Department Homicide Unit, which is a "controlled environment" with a secure entrance and secure interrogation rooms; he was placed in one of the secure interrogation rooms, which was guarded by a police officer; at times the door to the interrogation room was locked; he was not told that he was free to leave at any time; police denied his requests to leave through either direct statements or through attempts to "redirect" the conversation; when he asked if he could go outside for a cigarette, his request was denied; if he wanted something, he was required to go through a police officer to get it; and he was given no choice as to whether his interrogation with the police would be recorded or whether his hands would be tested for gunshot residue.

After a careful review of the record, we are satisfied that a reasonable person in Sterling's position would not have believed that he or she was in police custody to the degree associated with formal arrest at the time Sterling was taken to the Homicide Unit to be interrogated. It is clear from the record that police did not consider Sterling a suspect at the time they transported him to the Homicide Unit. In addition, Sterling was never placed under arrest and there is no indication from the record, and Sterling does not assert, that his decision to go to the Homicide Unit was anything other than voluntary. *See Thompson,* 788 N.W.2d at 492 (noting that voluntarily being transported to the police station for questioning weighed in favor of finding that the defendant was not in custody). Moreover, on the record presented here, the fact that Sterling was frisked before he was placed in the squad car does not suggest that he was in custody to the

degree associated with a formal arrest, particularly considering the trial court's finding that Sterling was never restrained by handcuffs or coerced by police force or at gunpoint. *See Vue*, 797 N.W.2d at 11 (noting that the defendant was not in custody even when he was briefly handcuffed because he was able to walk unrestrained in his yard). Further, there is nothing to suggest that police treated Sterling differently than the other residents of the house. Finally, we give little weight to the fact that police brought Sterling to the Homicide Unit instead of conducting the interrogation at his home. *See State v. Sirvio*, 579 N.W.2d 478, 481 (Minn.1998) ("The mere fact that the interrogation occurs at a police station does not require a determination that the questioning was custodial in nature."). At the time Sterling agreed to be questioned, his home was being processed as the scene of Kohorst's murder and was therefore not an environment conducive to conducting an interrogation.

We also conclude that a reasonable person in Sterling's position would not have believed that he was in custody to the degree associated with a formal arrest during the initial period of interrogation, which began when Sterling arrived at the Homicide Unit and ended after his formal statement was taken. During that time period, Sterling was never directly told that he was a suspect nor was he given any reason to believe he was a suspect. The officers never held him at gunpoint and, although there were times when he was questioned by two officers, multiple officers were generally not present during the interrogation. Additionally, Sterling steadfastly denied that he was involved in Kohorst's murder and never made a "significantly incriminating statement." *See Thompson*, 788 N.W.2d at 492 (noting that the fact that the defendant did not admit guilt or confess weighed in favor of concluding that he was not in custody).

With respect to Sterling's freedom of movement during the initial period of interrogation, the record supports the trial court's factual findings that (1) "there were many exchanges regarding [Sterling's] impatience, but also his willingness to remain and continue talking to detectives" and (2) that "[t]hroughout the majority of the initial interview the doors were left unlocked." In contrast, the record does not support Sterling's assertion that a police officer was guarding his room throughout the course of the interrogation because there were periods of time when Sergeants Dale and Granger were interrogating witnesses and were the only two officers in the Homicide Unit. Moreover, the fact that Sterling was required to go through an officer if he needed something does not change our analysis. Given that the officers were concerned with individuals gaining access to private information within the Homicide Unit, a reasonable person in Sterling's position would understand that such a restriction would apply to all visitors to the Homicide Unit without regard to one's connection to an investigation. And while it is true that Sterling was never told he was free to leave, on multiple occasions Sterling was reassured that someone would transport him to a place of his choosing once the interrogation was complete. *See State v. Scruggs*, 822 N.W.2d 631, 638 (Minn.2012) (explaining that statements by police indicating that they would return appellant to an apartment after the interrogation weighed in favor of finding that he was not in custody). Sterling was also told that he was being treated the same as Boatwright and Mercado. Therefore, on the record before us, we cannot say that Sterling's freedom of movement was constrained such that a reasonable person would believe he or she was in police custody to the degree associated with formal arrest. Thus, statements

made by Sterling up to the point in the interrogation when his formal statement ended were admissible.

■ According to the video of the interrogation, Sterling's formal statement ended at 9:45 a.m. When questioning resumed at 10:11 a.m., the tone and tenor of the interrogation changed. A review of the officers' questions from that point forward suggests that the officers began to view Sterling more as a suspect than as a witness. Their questions and comments became both accusatory and confrontational. For example, when Sterling responded to a question by stating he wished that he knew more about what had happened to Kohorst, the questioning officer responded: "I think you do. I think you know more," implying that Sterling was lying. At the same time, between 10:11 a.m. and Sterling's arrest shortly after 1:18 p.m., the officers made statements that would suggest to a reasonable person that Sterling was not in custody to the degree associated with a formal arrest. For example, during that time period, one officer indicated that the door to the interrogation room needed to be kept unlocked and Sterling was reassured that he was being treated the same as Boatwright and Mercado.

Ultimately, whether Sterling was in custody to the degree associated with formal arrest at some point between 10:11 a.m. and when he was formally arrested is a close question. But it is also a question we need not answer because we conclude that, even if the statements Sterling made during that time period were admitted in error, any such error was harmless beyond a reasonable doubt.

■ "When an error implicates a constitutional right, we will award a new trial unless the error is harmless beyond a reasonable doubt." *State v. Davis,* 820 N.W.2d 525, 533 (Minn.2012). "An error is

harmless beyond a reasonable doubt if the jury's verdict was surely unattributable to the error." *Id.* (internal quotation marks omitted); *Thompson,* 788 N.W.2d at 491. We have said that harmless error analysis "is better labelled as 'harmless error impact analysis'" because it is the impact of the error that the appellate court must consider. *State v. Juarez,* 572 N.W.2d 286, 291 (Minn.1997). In deciding whether an error is harmless beyond a reasonable doubt, we consider "the manner in which the evidence was presented, whether it was highly persuasive, whether it was used in closing argument, and whether it was effectively countered by the defendant." *State v. Al–Naseer,* 690 N.W.2d 744, 748 (Minn.2005). "The overwhelming evidence of guilt is a factor, often a very important one, in determining whether, beyond a reasonable doubt, the error has no impact on the verdict." *Juarez,* 572 N.W.2d at 291.

Roughly 3–1/2 hours elapsed between 10:11 a.m. and the time that Sterling was arrested. Of that 3–1/2–hour period, Sterling was subject to questioning for approximately 27 minutes. For the remainder of the time, Sterling sat alone in the interrogation room waiting. As for the statements Sterling made during that time period, Sterling does not identify any particular statements that he alleges were harmful, but generally argues that the admission of his statements was harmful because his statements contained inconsistencies that called his credibility into question and ultimately led to his arrest.

During trial, the State focused the jury's attention on six statements that Sterling made between 10:11 a.m. and his arrest. The State did so by introducing portions of the video of the interrogation and eliciting testimony from the officers involved in the interrogation. One statement involved Sterling asking an interrogating officer: "[W]hy are you smiling, like this is, like

this is some sort of fun thing?" Another statement involved Sterling saying: "I already told you I got blood on my hands" in response to being told that swabs of his hands were going to be taken. The State also introduced statements Sterling made when asked what he did with the high heels after he finished smoking: "I took 'em off in, uh, the kitchen. I walked, I threw them, I turned, I saw [Kohorst], I walked over barefoot." The State also introduced the statement "[n]o, I never said that," which Sterling made in response to an officer asking, "earlier you told me you came inside from your cigarette, and then you walked over to him?" The State introduced statements by Sterling that he "didn't think there was a problem" with eating his housemates' food because he had stopped, and that he denied that he had been threatened or told that he was going to be kicked out of the house. Finally, Sterling said he was wearing a "[purple] shirt and ... blue Levi's" in response to being asked what he was wearing when he left the house to smoke a cigarette.

With respect to these six statements, we first note that the statements are not inconsistent with each other. We further note that, to the extent the statements are inconsistent with statements Sterling made during the initial interrogation period, any such inconsistencies pale in comparison to the at least seven inconsistencies in Sterling's statements made during that initial interrogation period. For example, during the initial interrogation period, Sterling at one point said, "I took a shower because I sat on the couch," but later said, "I didn't sit on the couch." At one point, Sterling stated that after he found Kohorst's body, he got blood on his feet "[b]ecause [he] was barefoot, and then [he] went and took a shower." When later asked about the sequence of events immediately after Sterling found Kohorst's body, Sterling stated,

"I was wearing my heels, and um, I had already changed before um, I caught my breath." Sterling made a number of statements about the shower he took, but when asked later whether he showered or simply washed up, Sterling replied, "Um, I, I just, I washed up." When asked whether he turned on any lights in the house, Sterling stated, "The dining room." But when an officer said to Sterling "you told me earlier that you turned on the light when you came back inside the house after your cigarette," Sterling responded, "No, I didn't." During the questioning, Sterling indicated that he was in the kitchen when Kohorst returned from the concert, but when subsequently questioned about the timing of Kohorst's return, Sterling suggested that he was asleep in his room with the door locked when Kohorst returned. When asked where the blanket covering Kohorst's head was when Sterling found Kohorst, Sterling said, "I didn't notice the blanket." But when asked whether he covered Kohorst's head with a blanket, Sterling admitted that he did. Finally, when asked whether he pulled the blanket over Kohorst's head when he saw Kohorst dead on the couch, Sterling replied, "It was after." When the officer asked, "After what?," Sterling replied, "I'd say it was before."

Given these inconsistent statements, all of which Sterling made during the initial interrogation period, any damage to Sterling's credibility caused by inconsistent statements was due in large measure to statements properly admitted at trial. In addition, to the extent that any of the statements Sterling made after 10:11 a.m. were inconsistent with statements he made before that time, those inconsistencies likely did not further damage his credibility because, at most, they were cumulative.

Moreover, a review of the statements Sterling made after 10:11 a.m. that were

admitted at trial further confirms our conclusion that the admission of those statements was harmless. Sterling's question and comment about the officer smiling were not inconsistent with any other statement Sterling made and, therefore, could not have damaged his credibility based on being inconsistent. Similarly, Sterling's statement, "I already told you I got blood on my hands," was not harmful because it was consistent with statements Sterling made during the initial period of interrogation, which included statements acknowledging that he got Kohorst's blood "all over [him]," including on "[his] hands."

The statements Sterling made about what he did with his high heels when he entered the house after he finished smoking were no more harmful than the properly-admitted, inconsistent statements Sterling made during the initial period of interrogation as to whether he was wearing high heels. At most, these statements *reinforced* one of two or more inconsistent but admissible statements and did not create any new inconsistency in Sterling's story.

Sterling's denial in his post–10:11 a.m. statements that he had said he walked over to Kohorst when he returned to the house from smoking was inconsistent with statements Sterling made during the initial period of interrogation. However, this inconsistency by itself was certainly no more harmful to Sterling's credibility than the numerous admissible, inconsistent statements he made during the initial interrogation period.

Sterling's post–10:11 a.m. statements acknowledging problems he had with Kohorst and the others living in the house were also inconsistent with statements Sterling made during the initial interrogation period that were introduced at trial. But these statements likely had little impact on the jury's view of Sterling's credi-

bility given the evidence of those problems introduced at trial, which was unrelated to his statements. The State introduced extensive evidence contradicting Sterling's initial denials of problems in the house, including: (1) the text message Kohorst sent to Boatwright on October 16 indicating that he had warned Sterling that Sterling would be kicked out of the house if there were any more problems; (2) testimony by Kohorst's mother that her son told her there were problems in the house; and (3) Boatwright's testimony that Kohorst and the other tenants confronted Sterling about breaking the house rules. This evidence, which contradicted Sterling's pre–10:11 a.m. statements regarding problems he was having in the house, was far more persuasive and compelling than his post–10:11 a.m. statements because it illuminated a potential motive for Sterling to have killed Kohorst in ways that Sterling's statements could not.

Sterling's statement that he was wearing a purple shirt and Levi's when he went to smoke a cigarette was inconsistent with statements he made both before and after 10:11 a.m. that he was wearing a nightgown and jacket. But highlighting these inconsistencies was no doubt secondary to the State's principal purpose in introducing *all* of Sterling's statements describing his clothing: to show that Sterling was concealing the fact that he was wearing a bright green miniskirt and black leggings when he killed Kohorst—clothes that were never recovered by police, but that Barbara Kohorst testified Sterling was wearing the afternoon before the murder. Because Sterling had made statements before 10:11 a.m. that contradicted the State's theory about what Sterling was wearing, the introduction of Sterling's description of the purple shirt and Levi's merely reinforced the notion that Sterling was lying about his clothing. Therefore, the

damage, if any, to Sterling's credibility from the introduction of this statement was minimal.

The manner in which Sterling's statements were introduced—through the direct examination of Sergeant Dale and publication of the interrogation video to the jury—appears from the record to have been without drama or fanfare and likely had no unduly prejudicial effect on the jury's decision. Moreover, Sterling's counsel effectively countered the admission of Sterling's inconsistent statements by emphasizing that the inconsistencies were a result of the significant distress Sterling experienced in the hours after Kohorst's murder. And with respect to how Sterling's statements were used during closing argument, of the 55 pages of trial transcript dedicated to the State's closing argument, only three of Sterling's post–10:11 a.m. statements were referenced. We see nothing in how those statements were used in closing argument that would suggest that they were highly persuasive evidence of guilt.

Finally, given the strength of the evidence of guilt introduced at trial, the introduction of Sterling's statements made after 10:11 a.m. likely had no impact on the verdict. *See Juarez*, 572 N.W.2d at 291 (explaining that overwhelming evidence of guilt is often "a very important" factor in the harmlessness analysis). The pattern of Kohorst's blood on Sterling's high heels was consistent with the type of blood spatter that would result from the high heels being in close proximity to a beating, which indicates that the high heels were near Kohorst's body at the time Kohorst was beaten. The absence of any blood on the insoles of the high heels leads to the inference that they were being worn at the time the blood was deposited on them. Further, given the lack of any evidence from which the jury could infer that any-

one else had access to or possession of Sterling's high-heeled sandals, the only reasonable inference to be drawn is that Sterling was the person wearing the sandals when the blood was deposited on them and therefore was the killer. That Sterling was wearing the sandals at the time of Kohorst's murder and that he lied about having put them in his room before discovering Kohorst's body is also supported by Boatwright's testimony about hearing a sound that he associated with Sterling in high heels, clicking up and down the stairs, before and after he heard someone take a shower. In light of this strong evidence of Sterling's guilt, we are satisfied that the verdict was surely unattributable to any error in the admission of statements Sterling made after 10:11 a.m. For the foregoing reasons, we hold that any error in the admission of Sterling's post–10:11 a.m. statements was harmless beyond a reasonable doubt.

Because we conclude that Sterling was not in custody at any time before 10:11 a.m. and that any error in admitting Sterling's statements made after that time was harmless beyond a reasonable doubt, we conclude that Sterling's claims relating to the admission of his statements to the police fail.

## II.

 Sterling's second argument is that the circumstantial evidence produced at trial is insufficient to support his conviction. We apply a two-step analysis in determining whether circumstantial evidence is sufficient to support a guilty verdict. *State v. Andersen*, 784 N.W.2d 320, 329–30 (Minn.2010). The first step is to identify the circumstances proved. *Id.* at 329. The second step is to "determine whether the circumstances proved are 'consistent with guilt and inconsistent with any rational hypothesis except that of

guilt.'" *State v. Palmer,* 803 N.W.2d 727, 733 (Minn.2011) (quoting *Andersen,* 784 N.W.2d at 330). We review the circumstantial evidence not as isolated facts, but as a whole. *State v. Hurd,* 819 N.W.2d 591, 599 (Minn.2012).

In identifying the circumstances proved, we defer "'to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State.'" *Andersen,* 784 N.W.2d at 329 (quoting *State v. Stein,* 776 N.W.2d 709, 718 (Minn.2010) (plurality opinion)). As with direct evidence, we "construe conflicting evidence in the light most favorable to the verdict and assume that the jury believed the State's witnesses and disbelieved the defense witnesses." *State v. Tscheu,* 758 N.W.2d 849, 858 (Minn.2008). Stated differently, "in determining the circumstances proved, we consider only those circumstances that are consistent with the verdict." *State v. Hawes,* 801 N.W.2d 659, 670 (Minn.2011). This is because the jury is in the best position to evaluate the credibility of the evidence even in cases based on circumstantial evidence. *Id.*

Here, the circumstances proved are as follows. Because Sterling had broken certain house rules, his relationship with Kohorst had soured. In the days preceding the murder, Kohorst warned Sterling that any more problems would result in Sterling's eviction from the house. On the night of the murder, Sterling was in the house and was wearing high-heeled sandals. A pair of high-heeled sandals belonging to Sterling, which had blood spatter on the top and no blood on the insole, were recovered at the scene by the police. Articles of clothing worn by Sterling earlier that day were missing after the murder and were never recovered. Boatwright was also present in the house the night of the murder. Kohorst, who had been at a concert, returned to the house sometime between 11 p.m. and midnight, and talked with Boatwright in the living room for a short period of time. After Kohorst indicated to Boatwright that he wanted to go to sleep, Boatwright locked the front exterior door of the house and then went to his room. Approximately one hour later, Boatwright heard loud voices and the interior front door slamming shut. He went downstairs, noticed that both front doors were ajar, closed and locked the exterior door, closed the interior door, and went back to his room. Twenty minutes later, Boatwright heard high heels clicking up the stairs, which was a sound he commonly associated with Sterling. He then heard the shower turned on for ten minutes before hearing high heels clicking down the stairs. Fifteen minutes later, Boatwright heard someone yelling from the first floor, went to investigate, and saw Sterling standing approximately eight feet away from Kohorst's body. The living room wall was covered with blood. In addition to the missing clothing, the only other item missing from the house was a claw hammer that Kohorst had been using on a remodeling project at the house. That hammer was never recovered.

As noted, the presence of Kohorst's blood on Sterling's high heels and the absence of blood on the insoles is consistent with the high heels being worn while in the vicinity of a beating. In contrast, the pattern of the blood spatter is inconsistent with being cast off of the overhead ceiling fan in the living room. Blood found on Sterling's left hand and on the shower curtain matched Kohorst's DNA profile. Kohorst's injuries were consistent with Kohorst having been beaten with a claw hammer similar to the hammer the State introduced at trial, which, according to Boatwright, was an "exact replication" of

the hammer missing from the house. The police found no signs of forced entry, and no other items of value were missing from the house. Finally, Sterling made inconsistent statements to the police as to whether he turned on lights after returning from smoking a cigarette, whether he showered, whether he sat on the couch when he found Kohorst's body, and whether he was wearing high heels when he encountered Kohorst's body.

Under the second step of our analysis, we " 'examine independently the reasonableness of [the] inferences that might be drawn from the circumstances proved,' " including the inferences consistent with a hypothesis other than guilt. *Andersen,* 784 N.W.2d at 329 (quoting *Stein,* 776 N.W.2d at 716 (plurality opinion)). Under this second step, we must "determine whether the circumstances proved are 'consistent with guilt and inconsistent with any rational hypothesis except that of guilt,' not simply whether the inferences that point to guilt are reasonable." *Palmer,* 803 N.W.2d at 733 (quoting *Andersen,* 784 N.W.2d at 330). " '[W]e give no deference to the fact finder's choice between reasonable inferences.' " *Andersen,* 784 N.W.2d at 329–30 (quoting *Stein,* 776 N.W.2d at 716 (plurality opinion)).

Sterling concedes that one reasonable inference to be drawn from the circumstances proved is that he killed Kohorst, but argues that it is also reasonable to infer that either Boatwright or an intruder killed Kohorst. However, in light of the entire record, we conclude that such inferences are unreasonable. *See id.* at 329 (explaining that the court must "examine independently the *reasonableness* of all inferences that might be drawn from the circumstances proved" (quoting *Stein,* 776 N.W.2d at 716 (plurality opinion)) (emphasis added)). First, inferring that Boatwright is the killer is unreasonable considering that our standard for assessing the

sufficiency of circumstantial evidence requires us to assume that the jury believed Boatwright's testimony. *See Tscheu,* 758 N.W.2d at 858 ("[W]e ... construe conflicting evidence in the light most favorable to the verdict and assume that the jury believed the State's witnesses and disbelieved the defense witnesses."). Moreover, because there was no physical evidence linking Boatwright to Kohorst's murder and no evidence that Boatwright had a motive to kill Kohorst, any inference that Boatwright was the killer is mere conjecture. *See State v. Lahue,* 585 N.W.2d 785, 789 (Minn.1998) (explaining that a reviewing court "will not overturn a conviction based on circumstantial evidence on the basis of mere conjecture"). Second, inferring that an intruder killed Kohorst plainly contradicts the circumstances proved, which include the fact that Boatwright locked the front door when he first went upstairs to listen to music, there were no signs of forced entry, and nothing of value was taken from the home. Further, even though at the time of his testimony Boatwright could not remember whether he had locked the back door of the house, inferring that an intruder killed Kohorst is unreasonable because it is completely inconsistent with the presence of blood on Sterling's high heels.

As discussed in our harmless error analysis, the only reasonable inference to be drawn from the physical evidence relating to Sterling's high heels is that Sterling killed Kohorst. One can also infer from the missing articles of clothing that after Sterling beat Kohorst, he exited the house through the front doors and disposed of the hammer and bloody clothing. Indeed, these inferences are consistent with Boatwright hearing a door slam and subsequently finding both front doors ajar. Based on Boatwright's testimony and evidence of Kohorst's blood on the shower curtain, one can also infer that after Sterling returned to the house, he walked up

the stairs, took a shower, walked back down the stairs, and yelled to get Boatwright's attention. In sum, given the timing of the events on the night of the murder, one can infer from the circumstances proved that Sterling had the time and opportunity to kill Kohorst, shower, change clothes, dispose of the clothing and hammer, and then inform Boatwright that Kohorst was hurt. Thus, our review of the circumstances proved satisfies us that the evidence presented, when viewed as a whole, is sufficient to support Sterling's conviction.[2]

In conclusion, we hold that Sterling is not entitled to any relief on his claims that the statements he made to the police should have been suppressed and that the evidence is insufficient to support his conviction.[3] Therefore, we affirm.

Affirmed.

LILLEHAUG, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

**2.** Sterling also argues that, even if the evidence is legally sufficient, his conviction should be set aside in the interests of justice because there was no direct evidence linking him to the crime. But we have specifically rejected the notion that the State's burden in a circumstantial evidence case is anything more than proof beyond a reasonable doubt. *See State v. Hughes,* 749 N.W.2d 307, 312 (Minn.2008). We conclude that there is nothing unique about Sterling's case to merit a reversal of his conviction in the interests of justice.

**3.** As noted previously, Sterling in his pro se brief makes a number of assertions. His pro se brief does not, however, identify any specific claims of error. Moreover, many of the assertions made in the brief have no citation to or support in the record. To the extent

that, through his pro se brief, Sterling seeks to challenge the sufficiency of the evidence supporting his conviction, we conclude that his challenge fails for the reasons discussed in section II of this opinion. To the extent that Sterling's assertions in his pro se brief are intended to raise other claims without citation to the record or legal authority, we conclude that those claims, whatever they may be, fail. *See State v. Sontoya,* 788 N.W.2d 868, 876 (Minn.2010) (declining to consider the defendant's pro se claim because he did "not cite either the record or legal authority to support [the] claim"); *State v. Bartylla,* 755 N.W.2d 8, 22 (Minn.2008) ("We will not consider pro se claims on appeal that are unsupported by either arguments or citations to legal authority.").