*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0303**

State of Minnesota,
Respondent,

vs.

Peter Louis John,
Appellant.

**Filed April 4, 2016
Affirmed
Peterson, Judge**

Ramsey County District Court
File No. 62-CR-14-1708

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Peter R. Marker, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Sara J. Euteneuer, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Peterson, Presiding Judge; Ross, Judge; and Kirk, Judge.

**U N P U B L I S H E D   O P I N I O N**

**PETERSON**, Judge

Appellant challenges his conviction of aiding and abetting second-degree murder, arguing that the district court erroneously (1) admitted statements that he made to police before he received a *Miranda* warning, (2) excluded evidence of four reverse-*Spreigl*

incidents involving an alternative perpetrator, and (3) excluded evidence pertaining to a police investigator's disciplinary matter. He also argues that the district court failed to properly instruct the jury on accomplice liability. We affirm.

**FACTS**

During the late evening of March 10, 2014, J.S. died in a St. Paul apartment that was rented to J.B. Mark Healy, Ronald Ballinger, and appellant Peter John were with J.S. near the time of his death. J.B. was not at the apartment, and another man who had been at the apartment earlier in the evening, M.N., left before J.S. died. J.S.'s autopsy showed that he had multiple blunt-force traumatic injuries on his upper body and head, fractured ribs, and fractured thyroid cartilage; the specific cause of death was a blow near the carotid artery that caused his heart to stop. Some of the men at the apartment were chronic alcoholics, and they were drinking heavily that night. J.S.'s alcohol concentration when he died was 0.376.

According to Healy's trial testimony, while he was sitting in a recliner with headphones on waiting for J.B. to arrive home, an altercation broke out between J.S. and appellant and a third man whom Healy described as having long black hair and wearing a green military-style jacket. Healy testified that appellant "punched" J.S., J.S. fell to the floor and seemed unconscious, and appellant and the other man kicked J.S. repeatedly from the chest up. According to Healy, he pulled his headphones off and asked the other two, "What are you doing that for?" Appellant replied that J.S. was a child molester. Healy then went to sleep. When Healy awoke, appellant was sleeping next to him on a couch, and J.S. was dead on the floor with a pool of blood around his head. Healy checked for

2

J.S.'s pulse, realized that his body was cold, and called 911. Healy did not recall Ballinger being at the apartment.

M.N. testified that, before he left the apartment, Ballinger arrived with J.S., and, when he left, Healy and appellant were also there. When M.N. left, the others were all partying and "pretty drunk."

Ballinger testified that, at about 7:00 p.m. or 8:00 p.m., he and J.S. shoplifted some mouthwash containing alcohol. Then they panhandled to get money for beer and walked to J.B.'s apartment. Three or four other people that Ballinger did not know were at the apartment, and they were all drinking alcohol. According to Ballinger, J.S. got into an argument with appellant after appellant called J.S. "a child molester" or some other derogatory name, and appellant began hitting J.S. J.S. ended up on the floor with appellant hitting and kicking him, and "they were arguing about something, somebody was going to f--k somebody's sister." Ballinger testified that only appellant kicked J.S. After J.S. became unconscious, appellant asked Ballinger to help him move J.S.'s body to a dumpster, but Ballinger refused and left. Ballinger admitted that, in the past, he and J.S. had argued about the fact that J.S. had dated Ballinger's girlfriend, but he testified that they "made up" and "became friends again."

Following Healy's 911 call, eight police officers arrived at the scene, and one officer came later. They had to break into the apartment because the door was locked and Healy could not open it. When the police entered the apartment, Healy stood behind appellant and pointed at him. Police initially questioned appellant and Healy in the apartment but then placed them in separate squad cars. During his initial statements to police, appellant

3

suggested that J.S.'s death had been caused by three black youths who J.S. said had assaulted him before he came to the apartment.

DNA testing established that blood found on the pants worn by appellant, Ballinger, and Healy matched J.S.'s DNA. Also, Ballinger testified that he threw his shoes away on the day after the murder because they were old and wet, and he had been offered a new pair. A forensic expert could not determine whether the shoe impressions on J.S.'s body matched appellant's, Healy's, or M.N.'s shoes due to a lack of detail in the impressions.

Appellant was charged with aiding and abetting second-degree murder, and he was tried in a five-day jury trial. Before trial, the district court granted the state's motion to exclude evidence from a police sergeant's disciplinary record and granted in part appellant's motion to admit reverse-*Spreigl* evidence about Ballinger's past bad acts. Following appellant's conviction, the district court imposed an executed 198-month prison sentence.

## D E C I S I O N

### I. Evidentiary Rulings

*Squad Car Statements.*

Appellant argues that the district court erred by refusing to suppress statements that he made while he was detained in Officer Dominic Dzik's squad car before he received a *Miranda* warning. According to appellant, he remained in the squad car for more than an hour. While in the car, appellant told police what he had been doing earlier in the evening and described what J.S. said and did when he came to the apartment, including J.S.'s description of his attackers.

4

The Fifth Amendment to the United States Constitution provides that an accused has the right to be free from compelled self-incrimination. As a safeguard for this right, the United States Supreme Court has held that statements made by a suspect during a "custodial interrogation" are admissible only if the police provided a *Miranda* warning before the statements were made.

*State v. Sterling*, 834 N.W.2d 162, 168 (Minn. 2013); *see* U.S. Const. amend. V.; *Miranda v. Arizona*, 384 U.S. 436, 444-45, 86 S. Ct. 1602, 1612 (1966). "The issue of whether a suspect is in custody and therefore entitled to a *Miranda* warning presents a mixed question of law and fact qualifying for independent review." *Sterling*, 834 N.W.2d at 167 (quotation omitted).

In considering whether a constitutional violation occurred because a suspect was questioned without receiving a *Miranda* warning, we examine whether a suspect was in custody and subject to police interrogation. "[A] *Miranda* warning is required if a suspect is both in custody and subject to interrogation." *State v. Thompson*, 788 N.W.2d 485, 491 (Minn. 2010). The test for whether a suspect is in custody is whether, under all the circumstances presented, a reasonable person "would believe that he or she was in police custody *of the degree associated with formal arrest*." *State v. Champion*, 533 N.W.2d 40, 43, (Minn. 1995) (emphasis added).[1] Interrogation is "any words or actions on the part of

---

[1] Factors that suggest a suspect is in custody include:
> (1) the police interviewing the suspect at the police station; (2) the suspect being told he or she is a prime suspect in a crime; (3) the police restraining the suspect's freedom of movement; (4) the suspect making a significantly incriminating statement; (5) the presence of multiple officers; and (6) a gun pointing at the suspect.

police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *State v. Endrozo*, 578 N.W.2d 719, 724 (Minn. 1998) (quotation omitted).

Dzik testified at the hearing on the suppression motion that police were called "to assist medics on an unconscious male" at the apartment just after 1:00 a.m. Upon arrival, they spoke with Healy and appellant for a minute or two to assess what had happened. According to Officer Kong Xiong, appellant initially told them that J.S. had "stated that he was assaulted by three males at the intersection of 7th and Payne." Dzik testified that he decided to put appellant in the squad car because he and other officers were gathering information about whether a murder occurred and wanted to talk to witnesses at the scene.

Statements made while appellant was in Dzik's squad car were recorded and later admitted into evidence at trial. Initially, Dzik told appellant, "[W]e can't have you in the house right now just contaminating anything, ok? . . . Right now it's sorta like a crime scene. We're just investigating exactly what happened." Appellant responded, "Okay." Appellant was not handcuffed or formally placed under arrest.

---

*Sterling*, 834 N.W.2d at 168 (quotations omitted). Factors that suggest a person is not in custody include:

> (1) questioning the suspect in his or her home; (2) law enforcement expressly informing the suspect that he or she is not under arrest; (3) the suspect's leaving the police station without hindrance; (4) the brevity of questioning; (5) the suspect's ability to leave at any time; (6) the existence of a nonthreatening environment; and (7) the suspect's ability to make phone calls.

*Id.* (quotation omitted).

As they acquired information, police began to focus on appellant as a possible perpetrator, and they continued to hold him in the car while they went door-to-door to interview nearby residents. Eventually, appellant began to protest the length of his confinement, and he asked to return to the apartment and to have his identification returned. While apparently talking to himself in the car, appellant made comments such as "[c]'mon, let's get the f—k outta here" that suggest that he wanted to leave and was becoming angry about being detained. But it was not until an officer asked him how he was doing and he was told that he must remain in the car that he said, "I want my jacket and my ID and I'm gonna call my attorney." At that point, appellant was moved to Xiong's squad car, where he asked to speak to a lawyer.

The district court concluded that appellant "was not 'seized' in the Fifth Amendment sense" until he was moved to Xiong's car reasoning that "[t]he simple act of making an eyewitness to a possible homicide wait in the back of a squad car for a little over an hour while police tried to piece together preliminarily what had happened in a very complex situation did not render [appellant] in custody."

Initially, appellant was not in custody because police needed to sort out the crime scene and he agreed to, or at least acquiesced in, the restraint of his freedom of movement. Although there were several officers in the vicinity, appellant was not told that he was a suspect, and police made no show of force toward him. Also, both appellant and Healy were taken from the crime scene and placed in squad cars. The statements that appellant made while in the squad car about what occurred that night were no different than the statements he had made to police while inside the apartment, and therefore not particularly

7

incriminating. Considering the totality of circumstances, we conclude that appellant's detention became custodial only after his confinement was prolonged, he asked for his jacket and identification, and he said he wanted to speak to a lawyer.

As to whether appellant was interrogated, police asked him to relay what J.S. said about how he was injured, and what J.S. did after he entered the apartment. Appellant also identified who called police and described what he was doing that night. Although some of the questions that police asked could be characterized as interrogation, the questions were asked at the very beginning of appellant's detention, when he clearly was not in custody.

In its most recent opinion addressing admission of non-*Mirandized* statements, the supreme court declined to decide whether the detained suspect was in custody during an interrogation because it concluded that any error in admission of the evidence "was harmless beyond a reasonable doubt." *Sterling*, 834 N.W.2d at 171 (noting that question of whether suspect was in custody was "close," but declining to answer that question after concluding that admission of any statements "was harmless beyond a reasonable doubt"). An error is harmless beyond a reasonable doubt if the jury verdict is "surely unattributable to the error." *State v. Juarez*, 572 N.W.2d 286, 292 (Minn. 1997) (quotation omitted). To determine the impact of an erroneous admission of evidence, a court examines "the manner in which the evidence was presented, whether it was highly persuasive, whether it was used in closing argument, and whether it was effectively countered by the defendant." *State v. Al-Naseer*, 690 N.W.2d 744, 748 (Minn. 2005).

8

Ultimately, even if the district court erred in admitting statements that appellant made while in the squad car, any error was harmless beyond a reasonable doubt because appellant's guilty verdict was surely not attributable to that error. Statements that appellant made while in the squad car merely repeated statements he had made inside the apartment when the police first arrived. Because appellant's earlier statements were properly admitted at trial, admission of additional evidence repeating those statements had little evidentiary value. Also, appellant was convicted of aiding and abetting second-degree murder, and the evidence strongly supported a guilty verdict. Appellant was one of two individuals found in a locked apartment with J.S.'s body, police heard appellant ask Healy why he called the police, and appellant had J.S.'s blood on his pants. In addition, (1) the witnesses in the apartment described appellant as J.S.'s main attacker; (2) medical evidence that showed that J.S. died immediately upon receiving his injuries contradicted appellant's claim that J.S. was attacked before he arrived at the apartment; and (3) surveillance videos corroborated Ballinger's testimony about what he did before he came to the apartment, which supported the overall credibility of his testimony despite his being under the influence of alcohol. Any error in the district court's admission of statements that appellant made before he received a *Miranda* warning was harmless beyond a reasonable doubt.

*Reverse-Spreigl Evidence*.

Appellant argues that the district court erroneously denied his motion to admit evidence of four out of six reverse-*Spreigl* incidents that involved Ballinger,[2] who appellant

---

[2] There were actually seven prior incidents, but appellant concedes that the district court properly excluded a 2011 incident involving Ballinger's violation of a no-contact order.

9

argued was an alternative perpetrator of the crime. The district court allowed appellant to present evidence of Ballinger's 2008 disorderly-conduct conviction and his 2011 domestic-assault conviction. The 2008 disorderly-conduct conviction involved conduct similar to the conduct at issue in this case, and the victim in the 2011 domestic-assault conviction was Ballinger's girlfriend, who also dated J.S. The reverse-*Spreigl* evidence that the district court refused to admit involved Ballinger's felony-level domestic-assault convictions in 2012 and 2014 and a 2004 assault and 2013 domestic assault that were not charged.

> A defendant has a constitutional right to present a complete defense, which includes the right to present evidence that the crime was committed by another person. The purpose of alternative-perpetrator evidence is to create a reasonable doubt as to the defendant's guilt. Alternative-perpetrator evidence is admissible only when it has an inherent tendency to connect the alternative party with the commission of the crime. After meeting this threshold requirement, the defendant must meet three additional requirements before introducing evidence of other bad acts committed by the alternative perpetrator, which is commonly referred to as reverse-*Spreigl* evidence. The defendant must show (1) clear and convincing evidence that the alleged alternative perpetrator participated in the reverse-*Spreigl* incident; (2) that the reverse-*Spreigl* incident is relevant and material to defendant's case; and (3) that the probative value of the evidence outweighs its potential for unfair prejudice.

*State v. Davis*, 864 N.W.2d 171, 180 (Minn. 2015) (citations and quotations omitted). We review the district court's decision regarding the admission of reverse-*Spreigl* evidence for an abuse of discretion, and "[r]eversal is warranted only when an erroneous ruling result[s] in prejudice." *Id.* at 179-80.

10

The district court admitted Ballinger's two most relevant prior convictions. The 2011 domestic assault of his girlfriend, who had dated J.S., suggested a possible rivalry between Ballinger and J.S., which could be a motive for Ballinger to commit the current crime. And the 2008 disorderly-conduct conviction involved a modus operandi that was similar to the current offense: Ballinger and three others assaulted the victim with their fists, the victim's blood was found on Ballinger's clothing, and Ballinger fled the scene after the event. The remaining excluded acts involved Ballinger assaulting his girlfriend. Because the district court admitted the most recent conviction in which Ballinger's girlfriend was the victim, admission of further similar acts by Ballinger was cumulative, could confuse the jury, and could ultimately be prejudicial. The district court acted within its discretion in ruling to exclude this evidence.

*Police Disciplinary Matter*.

Appellant argues that the district court abused its discretion by refusing to admit evidence that the police sergeant who was the lead investigator in this case was disciplined in 2000 for filing a false police report and in 2002 for failing to follow police procedures before removing $3,500 of confiscated money from a police property room, permitting the money to be used in a controlled buy, and returning the money to the property room.[3] The district court denied appellant's motion to cross-examine the sergeant about this past conduct to undermine his credibility.

---

[3] We disagree with appellant's repeated characterization of this conduct as theft.

If probative of truthfulness or untruthfulness, specific instances of the conduct of a witness may be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness. Minn. R. Evid. 608(b)(1). Under Minn. R. Evid. 403, the district court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." If a witness's credibility is a central issue, the need for impeachment may be greater. *See State v. Flemino*, 721 N.W.2d 326, 330 (Minn. App. 2006) (addressing admissibility of prior convictions to impeach a defendant and stating that the need for impeachment is greater "when a defendant's credibility is crucial" (quotation omitted)). As with other evidentiary rulings, a decision to allow the impeachment of a witness is within the district court's discretion and subject to reversal only if there is an abuse of that discretion. *State v. Haynes*, 725 N.W.2d 524, 530 (Minn. 2007).

While evidence of the sergeant's disciplinary matter may have been probative of his credibility, the district court applied both rule 608 and rule 403 and considered the relevant factors in reaching its decision to exclude the evidence. The district court found that the sergeant's credibility was "critical to the state's case" because "he was responsible for much of the physical evidence obtained in the investigation." But the district court also found that the isolated incidents were stale and merely demonstrated that the sergeant failed to follow police procedures. The court also applied the balancing test of rule 403 to conclude that the risk of prejudice from admitting the evidence outweighed its probative

12

value because the evidence could cause jury confusion, mislead the jury, or delay the trial. The district court's ruling was not an abuse of its discretion.

## II. Accomplice Instruction

The district court gave the jury the following accomplice instruction:

> You cannot find [appellant] guilty of a crime on the testimony of a person who could be charged with that crime, unless the testimony is corroborated by other evidence that tends to convict [appellant] of the crime. Such a person who could be charged for the same crime is called an accomplice.

> If you find that Mark Healy, [or] Ronald Ballinger . . . could be charged with the same crime as [appellant], you cannot find [appellant] guilty of a crime on their testimony, unless that testimony is corroborated.

Appellant argues that the district court should have instructed the jury that Healy and Ballinger were accomplices as a matter of law, rather than allowing the jury to decide whether they could be charged with the same crime as appellant. 10 *Minnesota Practice*, CRIMJIG 3.18 (2006).

A district court must instruct a jury on accomplice testimony in any criminal trial in which a witness against a defendant may reasonably be considered an accomplice. *State v. Strommen*, 648 N.W.2d 681, 689 (Minn. 2002); *see* Minn. Stat. § 634.04 (2014) (stating that a conviction may not rely on the uncorroborated testimony of an accomplice). A witness is an accomplice if the witness "could have been indicted and convicted for the crime with which the accused is charged." *State v. Lee*, 683 N.W.2d 309, 314 (Minn. 2004) (quotation omitted).

> If the facts of the case are undisputed and there is only one inference to be drawn as to whether the witness is an

> accomplice, the court should make the determination; but if the evidence is disputed or susceptible to different interpretations, then the question whether the witness is an accomplice is one of fact for the jury.

*Id.* (quotation omitted); *see State v. Pendleton*, 759 N.W.2d 900, 907 (Minn. 2009) (requiring district court "to name specific accomplices" in instructing the jury only if "the facts are undisputed or compel but a single inference" (quotation omitted)). A district court's decision on whether to give a particular jury instruction is reviewed under the abuse-of-discretion standard. *Pendleton*, 759 N.W.2d at 907.

The evidence regarding Healy's, Ballinger's, and appellant's conduct on the night of the murder was disputed and susceptible to different interpretations. Although the record contains evidence that Healy and Ballinger were merely present at the scene, other evidence indicates that they were involved in the offense. *See State v. Scruggs*, 822 N.W.2d 631, 640 (Minn. 2012) (noting distinction "between playing a knowing role in the crime and mere presence at the scene, inaction, knowledge and passive acquiescence" (quotation omitted)); *Pendleton*, 759 N.W.2d at 907 (stating that a witness must play a knowing role in the crime to be an accomplice and that mere presence at the scene is insufficient). Under these circumstances, the district court's decision to instruct the jury on accomplice liability as a fact question for the jury was not an abuse of discretion.

**Affirmed**.